**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**[2] PASCUAL SANTIAGO-MENDEZ,**<br>**[3] ANTHONY DOMINGUEZ-COLON**<br>**[4] VICTOR CORTES-CABAN**<br>**[5] LUIS RUPERTO-TORRES**<br><br>Defendants. | **CRIMINAL NO. 07-346 (DRD)** |

AMENDED ORDER DENYING BAIL

Pending before the court is a barrage of emergency motions requesting reconsideration of the bail request denied by the court on the afternoon of the verdict on December 19, 2008.

FACTUAL AND PROCEDURAL BACKGROUND

Co-defendants [2] Pascual Santiago-Méndez, [3] Anthony Domínguez-Colón, [4] Víctor Cortes-Cabán, and [5] Luis Ruperto-Torres were all found guilty of Count One of the indictment charging a violation of civil rights under 18 U.S.C. 241 consisting of the deprivation of enjoyment of rights secured by citizens to be free from injury, oppression, threats, and intimidation in the free exercise of rights secured to them by the United States Constitution. The specific rights constituted "unreasonable search and seizure by one acting under color of law (co-defendants acting as policemen) to be free from being detained and arrested based on fabricated evidence (the planting of drugs by police

1

officers) and "[t]he right not to be deprived of liberty without due process of law, which includes the right not to have false evidence (planting of drugs presented against them, citizens of the town of Mayaguez) by one acting under color of law." (Indictment Docket 3, id.)

Co-defendants [2] Pascual Santiago Méndez, [3] Anthony Domínguez Colón, [4] Víctor Cortes Caban, and [ ] Luis Ruperto Torres were found also guilty of Count Two which was a conspiracy to possess with intent to distribute controlled substances (marihuana, cocaine, cocaine base and heroin) of sufficient amount found by the jury warranting a jail sentence of at least five years and up to a maximum of forty years.[1]  A black box containing all varieties of drugs was regularly located at the offices of co-defendant [2] Pascual Santiago Méndez in a file cabinet under his control which was temporarily transferred in his absence to the work desk of [6] Luis Vélez Class. The object of the conspiracy was "to possess with intent to distribute controlled substances (to be used) in the fabrication of cases in the Commonwealth of Puerto Rico." Co-defendant Luis Ruperto Torres was found innocent of the narcotics' conspiracy, Count No. 2.[2]

The court was not originally convinced on the afternoon of the verdict that the defendants charged under the civil rights violations produced "clear and convincing evidence" that they were not a danger to the community, the presumption of detention

---

[1]     The threshold is reached by the amount of crack cocaine and heroin found in a black box product of a federal search warrant in the offices of defendants specifically co-defendant Vélez Class which box contained sufficient amount to warrant reaching the threshold of a sentence of five to forty years.

[2]     Co-defendant [10] Efrain Bey-Arce  was found innocent. Other co-defendants plead, some with a cooperation agreement, others cooperated without a cooperation agreement. Co-defendant Michael Monsegur-González merely plead and did not cooperate. Co-defendants [1] Dennis Muñiz Tirado, [6] Vélez Class and [7] Josue Bosques-Muñiz plead and cooperated as government witnesses.

prevailing over the individual proffers of the defendants made by their respective counsel. As to the defendants found guilty as to the drug conspiracy, all co-defendants except [5] Luis Ruperto Torres, the court found that they were a danger to the community, the presumption of danger to the community prevailing for a violation of a narcotic violation involving a sentence of ten or more years.

The pending motions are the following: "Emergency Motion Requesting Reconsideration of Bail Denial Pending Sentencing et al." filed by co-defendant [5] Luis Ruperto Torres, Docket No. 420; "Motion Requesting Bail Pending Sentence" filed by co-defendant [2] Pascual Santiago Méndez, Docket No. 436; "Motion Requesting Co-defendants Request for Bail and Hearing" filed by co-defendant Anthony Domínguez Colón, Docket No. 432; "Second Urgent Motion for Reconsideration and Bail" filed by co-defendant [5] Luis Ruperto Torres, Docket No. 440[3]; "Motion Joining Co-defendants Request for Bail and Hearing" filed by co-defendant [4] Víctor Cortes Caban, Docket No. 442. The court held a hearing after the court re-opened after the holidays on December 29, 2008. (D. 452.)

Co-defendant [5] Luis Ruperto Torres in his original motion alleges that because he was found innocent as to the drug count, the same conclusion must follow in the second count.  He thus alleges an inconsistent verdict resolution. The court disagrees based on jurisprudence set forth by the Supreme Court. (See discussion infra.)

Co-defendant [5] Luis Ruperto Torres further alleges that he is the father of five children ranging between the ages of 27 to 7 years and raising two children of his current

---

[3]    The second request of co-defendant Luis Ruperto Torres was filed barely forty-eight hours after the initial request at Docket No. 420.

wife, ages 10 and 7 years old. He has no prior record and has been a policeman for seventeen (17) years with a clear record, promoted to Sargent, now married to a policewoman. He allegedly complies with the criteria of not likely to flee and not posing a danger to the community. Further, it is alleged, that he is no longer a member of the police and unlikely to continue his conduct. He is not likely to flee because the maximum sentence is only 10 years and his guideline sentence is not "more than three years." (Docket No. 420 p. 5.)[4]  Defendant emphasizes the necessity of the children being with their father in Christmas Season for the well being of his family ties. Defendant moves the court for more stringent conditions of release in substitution of imprisonment. Defendant further alleges that he has a strong case of dismissal under Rule 29. The court agrees that the proper standard is the case of United States v. Bayko, 774 F.2d 516, 522-523 (1st Cir. 1985). But the issue in the court's opinion is first one of sufficiency of evidence which the court discusses on a defendant to defendant basis infra. Defendant further alleges that no overt charges were charged nor proven as to [5] Luis Ruperto Torres "review[ing] and approv[ing] false statements." Docket No. 420, p. 8. But, the issue is not whether defendant actually incurred in a specific substantive conduct of the conspiracy; the issue

---

[4]     But the guidelines computed by defendant understates the offense and does not compute a potential role in the offense under USSG 3B.1.1 or 3B.1.2; nor includes potential aggravating factors such as uncharged similar civil rights offenses which defendant admitted in one of the video tapes (admission by co-defendant in a video tape of similar violative civil rights conduct, fabrication of evidence against persons stopped for driving under the influence of excessive alcohol. U.S. v. Mack, 938 F.2d 678 (1st Cir. 1991) (sentencing may include prior uncharged conduct); U.S. v. Lombard, 72 F.3d 170 (1st Cir. 1995), prior conduct is to be considered as part of relevant conduct. USSG 1.B1.3 (additional victims). Further, the advisory guidelines constitute a proper place to begin a 18 U.S.C. 3553(a)(1)(2) statutory sentence to a "sufficient but not greater than necessary sentence." The ultimate sentences may be higher or lower than the United States Guidelines. See Gall v. United States, ___U.S.___, 128 S. Ct. 586, 169 L. Ed 2d 445 (2007).

is if he participated in the "plan to violate civil rights." Defendant's counsel also avers that defendant is not a danger to the community because he is no longer a member of the police force, and, hence, is impeded from continuing with the fabrication of evidence. But defendant does not account for the presumption of danger to the community created by the conviction, discussed infra nor the potential danger to the three co-defendants who testified against all co-defendants who faced the criminal charges. (See discussion infra.) Finally, defendant [5] Luis Ruperto Torres alleges that he has no proclivity "to violate the civil rights of citizens." His admissions in the video, Ex. 11, indicate the contrary (see discussion infra). (Docket No. 420 p. 9.) He therefore requests bail.

Co-defendant [2] Pascual Santiago-Méndez request bond on the hearing date following the bail relief of co-defendant [5] Luis Ruperto Torres and requests to join. (Docket No. 436.) Co-defendant [3] Anthony Domínguez-Colón joins the request for bail of other co-defendants at Docket No. 437. Co-defendant Domínguez accepts that he made a threat to cooperator co-defendant [7] Josue Bosques-Muñiz but that Bosques-Muñiz never felt threatened. Further, Domínguez and his wife received various phone calls afterwards from Bosques Muñiz offering help as to the trial.  The wife of Domínguez testified that all the phone calls occurred before Josue Bosques-Muñiz became known as a testimonial cooperator with the government. Co-defendant Domínguez-Colón alleges that he is neither a flight risk nor a danger to the community. Co-defendant Domínguez further urges the imposition of other more stringent bail conditions instead of detention. He urges bail considering his compliance with prior court bail conditions.

Co-defendant [4] Cortes-Caban filed a motion entitled "Motion Joining Co-defendants Request for Bail and Hearing," Docket No. 442. Co-defendant Cortes-Caban

5

avers that by "clear and convincing evidence" the court has authority to determine that defendant is not a flight risk nor a danger to the community. Defendant avers that "he is not likely to flee nor does he pose a danger to anyone." (Docket No. 442, p. 1). He further urges the court to impose more stringent conditions including increasing the money guarantee and including a family member as a third party custodian. He also alleges that he has faithfully complied with all bond obligations during the last year and hence "there is no reason he will not [continue] to comply." (Docket No. 442 p. 2.)

The United States filed a timely opposition to the motions for the release of all defendants at Docket No. 445. The United States first stresses the court as to the guidelines calculations proposed by co-defendant Ruperto Torres that the calculation made by defense counsel at Docket No. 420 are understated. Notwithstanding not including any potential role in the offense, yield an adjusted offense level of twenty-three (23) points meaning a potential sentence of 43 to 57 months.[5]  Further, all appearing defendants, except Luis Ruperto Torres, were found guilty as to Count Two, the drug conspiracy charge (possession with intent to distribute) are facing a statutory minimum of five years and a maximum of forty years. The United States reiterates that pursuant to 18 U.S.C. 3143 the defendants are presumed to be detained except if they prove by "clear and convincing evidence" that they are not to flee nor a danger to the community. The defendants may also raise after verdict a substantive legal or factual  issue to the trial court that complies with the standard set forth under United States v. Bayko, 774 F.2d 516, 523 (1st Cir. 1985)

---

[5]        The calculation does not include a potential upward adjustment for uncharged conduct admitted by co-defendant constituting prior civil rights violations performed by co-defendant which the court may take into consideration under USSG 1.B.1.3 and 18 USC 3553(a)(1) "history and characteristics of the defendant."

which may cause that bail be granted. The court must, therefore, examine the legal issues raised by the defendants that may exculpate them.

The United States, in performing an analysis of the evidence, considers that co-defendant Domínguez-Colón made a threat on the life of a cooperator, co-defendant Josue Bosques-Muñiz, who gathered in video and audio tapes most of the incriminating evidence as to the co-defendants. Originally Bosques-Muñiz did not feel threatened because at the time, he was not a known active cooperator. After receiving the original threat, he testified in court and became a target of threat that is now a reality as a known cooperator and principal witness.

As to co-defendant Luis Ruperto Torres, who was found guilty only as to Count One, notwithstanding that the defendant alleges that there is no evidence as to civil rights violations, the government alleges that the jury found otherwise. The matter will be examined by the court under a sufficiency of evidence to convict argument under the Rule 29 standard.

The remaining co-defendants were found guilty as to Count One, violation of civil rights, as well as to Count Two the drug charge. Hence, they are presumed to be, according to the United States, by the verdict a danger to the community as well as risk of flight. The risk of flight danger is raised also by a potentially stronger sentence under the narcotics law. (The sentence by the amount of drugs found proven by the jury is from five to forty years.) The United States urges that the bail request made by defendants be denied.

7

THE STANDARD UNDER 18 USC 3143
BAIL PENDING SENTENCE ON APPEAL

The court follows the standard for bail pending sentence on appeal as set by the Court of Appeals in the cases of United States v. Bayko, 774 F.2d 516, 520-523 (1st Cir. 1985); United States v. Castiello, 878 F.2d 554 (1st Cir. 1989) and United States v. Abuhamra, 389 F.3d 309, 317-321 (2nd Cir. 2004).

The case of United States v. Bayko, 774 F.2d 516, sets forth at the beginning a discussion as to the standard for review which is not of this court's concern.[6]  The court, however, determined that "the defendant must show (meaning that the defendant has the burden) 'by clear and convincing evidence' that he or she 'is not likely to flee or pose a danger to the safety of any other person or of the community if released." United States v. Bayko, 774 F.2d at 520, citing 18 U.S.C.A. 3143(b) (1985). The case of Bayko is also critical as to the significance of an appeal that potentially "raises a substantial question of law or fact likely to result in the reversal" under 18 U.S.C.A. (a)(2)(A) (i).   United States v. Bayko, 774 F.2d at 521-522. Said "substantial question" is to be discussed infra. The case of Costiello, 878 F.2d 554, authorizes the court to use as criteria, as to fligh risk, the length of the potential sentence.

The case of  United States v. Abuhamra, 389 F.3d 309, 317-321 discusses the constitutional and statutory ramifications of the Bail Review Act particularly after a verdict has been rendered. First, a defendant "having been found guilty beyond a reasonable doubt at trial of felony crimes . . . has no substantive constitutional right to bail pending

---

[6]     The standard is independent review tempered by deference to the District Court's original judgment. See also United States v. Tortora, 992 F.2d 880, 882 (1st Cir. 1992) ("independent review tempered by a degree of deference to the determinations made below.") United States v. Bayko, 774 F.2d at 519-520.

sentencing." United States v. Abuhamra, 389 F.3d at 317. Further, after guilt determination in a felony case, "present federal law  disfavors release on bail," United States v. Abuhamra, Id., as the statute has a presumption of detention by express language. 18 U.S.C. 3143. (The defendant is to be "detained" unless the guideline calculation does not recommend a term of imprisonment and/or the United States recommends a sentence of no imprisonment. The defendant carries the burden by establishing under "clear and convincing evidence" standard that he "is not likely to flee or pose a danger to the safety of any other person or the community if released . . ." 18 U.S.C. 3143(a). (. . ."Once a defendant is afforded the considerable process and constitutional protections of a jury trial and found guilty beyond a reasonable doubt, the substantive interest in avoiding punitive detention essentially disappears, and any continued expectation of liberty pending final sentencing depends largely on the statute." United States v. Abuhamra, Id. After perusing the constitutional dimensions, the court now proceeds to examine the statutory requirements to determine release and/or detention.

Firstly, "the statute . . . the Bail Reform Act of 1984 creates no general expectation of post verdict liberty. To the contrary, it establishes a presumption in favor of detention." See 18 U.S.C. 3143(a); see also S. Rep. No. 225, 98th Congress, 1st Sess. 26 (1983), reprinted in 1984 U.S. Code Cong. and Administrative News 3182, 3209 (Once guilt of a crime has been established in a court of law, there is no reason to favor release pending imposition of sentence or appeal.) "To secure release on bail after a guilty verdict, a defendant must rebut this presumption with clear and convincing evidence that he is not a risk of flight or a danger to any other person or the community. Citations omitted . . ." ("The Committee intends that in overcoming the presumption in favor of detention [in 3143]

9

the **burden of proof rests with the defendant.)** (Emphasis ours.)

Notwithstanding, "while this burden is plainly substantial, if a defendant can make the required evidentiary showing, the statute establishes a right to liberty that is not simply discretionary but mandatory. The [trial] judge "shall order the release of the person in accordance with Section 3142(b) or ( c)." United States v. Abuhamra, Id.

Hence, the burden of proving by the standard of "clear and convincing evidence" is on the defendant, the burden "is plainly substantial," should the defendant comply the judge "shall order the release of the [affected] person." Therefore, the language of §3143(a) "confers sufficient liberty interest in continued release . . . to warrant some measure of protection." United States v. Abuhamra, Id. citing Wolf v. McDonald, 418 U.S. 539, 557 (1974).

However, the individuals release, liberty interest must, on the other hand, be weighted against the government's "strong and obvious countervailing interest in detaining defendants who have been found guilty beyond a reasonable doubt of serious crimes; such detention providing public safety by removing a presumptively dangerous person from the community; it also encourages general respect for the law by signaling that a guilty person will not be able to avoid or delay imposition and service of the sentence prescribed by law." United States v. Abuhamra, 389 F.3d at 320.

The enacting Congress, as to the Bail Reform Act, clearly expressed serious concerns relating to continued crimes being committed by person who where then in release of a prior crime and providing the trial courts with authority to detain dangerously and/or likely to flee individuals who have been found guilty. See Rep. 225 supra at 26 reprinted in 1984 U.S. Code Cong. and Administrative Laws at 3185 cited at United States

v. Abuhamra, 389 F.3d at 320. "Many of the changes in the Bail Reform Act . . . reflect the committees' determination that federal bail law must address the alarming problem of crimes committed by persons on release and must give courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released."

The government's interest "in community safety can, in appropriate circumstances, outweigh [that] liberty interest [of the defendant]." United States v. Salermo, 431 U.S. 739, 748 (1987) cited at Abuhamra, Id.

The court is particularly conscious that "the fact that a person has been found guilty, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness." Jones v. United States, 463 U.S. 354, 364 (1983) cited at Abuhamra, Id. The court notes that a person who fabricates evidence in violation of due process, either to apprehend those the police consider eluding the law, or as a personal vendetta, are engaged in a serious violation, all signifying a presumptable rebutable presumption that may be rebutable but nevertheless a strong presumption of dangerousness.

The same conclusion of dangerousness applies to the crime of drugs by express congressional mandate contained at 18 U.S.C. 3143(a)(2) referring to a detention of a person found guilty wherein a maximum term of ten years or more is contemplated under the Controlled Substances Act as set forth at 18 U.S.C.A. 3142(f)(1)( c) except if the person has filed a motion which "the judicial officer finds there is substantial likelihood that a motion for acquittal will be granted" under 18 U.S.C.A. 3143(a)(2)(A).

In United States v. Bayko, 774 F.2d at 522-523, the First Circuit Court interprets the phrase "substantial question of law or fact" to mean that the matter is a "close question or

one that very well could be decided the other way," adopting the standard of <u>United States v. Giancola</u>, 754 F.2d 899, 901 (1st Cir. 1985). The court in <u>Bayko</u>, 774 F.2d at 523 concluded that "[w]e think that the Giancola test more accurately reflects the intent of Congress." As stated before, the court must analyze any legal or factual arguments which may be "close" causing exculpation of the verdict. These arguments are analyzed separately.

THE APPLICABILITY OF THE STANDARD TO<br>EACH CO-DEFENDANT

A. Anthony Domínguez

At the reconsideration hearing of bail co-defendant Anthony Domínguez, hereinafter referred to as "Domínguez" requested more stringent bail conditions short of outright detention. An additional monetary guarantee was offered; house arrest was urged to be sufficient with an electronic monitoring device.

Further, co-defendant Domínguez proffered through counsel that even after the threat expressed to co-defendant José Bosques by Domínguez, Bosques continued to call him and his wife in a cordial friendly manner and the then unknown to be a cooperator urged Domínguez to fight the case. Bosques, therefore, offered help to Domínguez in his case. However, at the time the phone calls were made by Bosques to Domínguez and his wife, neither of them knew Bosques was in fact the principal cooperator of the case who, was in fact wired and video taped serious incriminatory evidence. Domínguez further alleges that he has complied with all pre-trial conditions of detention.

Domínguez stands convicted of a count of conspiracy related to a violation of possession of drugs with intent to distribute, and a count of violation of civil rights by

violation of due process by fabrication of evidence, being the fabrication one performed through the use of drugs.

All defendants, except Luis Ruperto Torres, alleged that they have a close question of law under Bayko in that the drug conspiracy case constitutes "a close question [of law] or one that may well be decided the other way." United States v. Bayko, 774 F/2d at 522-523. The court opines differently. First, co-defendants Pascual Santiago and Vélez Class had access to a black box wherein drugs were stashed to be later distributed to other co-defendants to fabricate cases. The drugs that were in the black box were in fact scientifically tested and were proven to be marihuana, cocaine chloride, cocaine base and heroin. These drugs were in fact distributed to other policemen and they used the narcotics to plant them to otherwise innocent citizens. At least the first transaction from the policeman who possessed the black box to other public officers constituted a distribution of narcotics. The court grants that the distribution was not intended for profits but was intended to be further planted to fabricate a criminal case. But the distribution does not have to be for profit. The ultimate purpose of the plan was to distribute the illegal narcotics, already distributed, and to be ultimately used for the illegal purpose of fabricating evidence. That is, it is the court's opinion that although the final purpose was to fabricate a criminal case, the prior step was one of a plan to possess drugs with intent to distribute the drugs from one policeman in possession to distribute to another policeman recipient of the drugs. That initial interchange involved a plan of possession with intent to distribute illegal narcotics. The fact that the final link in the chain is not for profit, and the final recipient ignored that he has been distributed drugs, does not eradicate the prior steps in the conspiracy of stashing drugs in joint possession form, as many policemen had access to

the drugs and distributed them to other policeman. See Ex. 4(a)-(g).  The drugs were to be distributed later to another policeman with a final outcome of a fabrication of a criminal case. Notwithstanding the trial court's opinion, the court grants for arguments sake that the matter constitutes a close case, as it is a case of first impression, one that may be very well "decided the other way."[7]

That leaves then for analysis by the court  the guilty verdict of Domínguez under the civil rights case and whether he is to be granted bail or remain detained for that violation.

The court analyses first the evidence for satisfaction of sufficiency of evidence as to the defendant Domínguez, and all others found guilty co-defendants, under the standard of  "in the light most flattering to the government and taking all reasonable inferences on its favor, a rational fact finder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994) reiterated at United States v. Hernández, 146 F.3d 30, 32 (1st Cir. 1998). Further, and most critical "the trial judge must resolve all evidentiary conflicts and credibility determination in the prosecution's favor, and moreover, as among competing inferences, two or more which are plausible, the judge must choose the inference that best fits the prosecution theory of guilt."  United States v. Olbres, 61 F.3d 967, 970 (1st Cir.

---

[7]  Notwithstanding the court emphasizes that the quantity of drugs found in the black box qualifies the instant drug crime under the Bail Reform Act as one that activates the presumption of "danger to the community" because under Section 3143 there is a cross reference of detention for persons under Section 3142f(1)(A)(B) or ( C) and Section ( C) that constitutes a rebuttable detention when the maximum term of imprisonment is "ten years or more" under the Controlled Substances Act. In the instant case the maximum term is activated by the potential sentence of five to forty years determined by the drug amount present on the "black box" as testified by the expert chemist, Peter E. Echevarri. The court recognizes as previously stated  that under United States v. Bayko, 774 F.2d at 521-523 there is a recognized exception for cases wherein there is present a legal or factual issue that constitutes "a close question or one that very well could be decided the other way."

1995).  On the other hand, the court must always satisfy itself "that the guilty verdict finds support in the plausible rendition of the record." United States v. Gómez, 255 F.3d 31, 35 (1st Cir. 2001).

The evidence against co-defendant Domínguez is strong. Bosques the principal cooperator originally calls by phone and advises Pascual Santiago that there are "mother fuckers from over there driving me nuts and I do not know what to do . . . " Pascual states: "Well you know what you have to do." Bosques says: "But I need to get some" [referring to drugs]. Pascual says: "All right come over." Bosques then asks "can I come down?" Bosques says "at least a couple of bags [unineligible]" [later it is clear by subsequent conversations on the same day that it was a couple of bags of small quantities of marihuana and cocaine.] Pascual Santiago agrees and says "all right sir, yes, yes." Ex. 4(a).

Pascual later states to Bosques that co-defendant Luis Vélez-Class is to provide the drugs. I left it with Velez." Ex. 4b.  Pascual Santiago states that it was "whatever you want [referring to the drugs]." But Vélez Class is with his wife in San Juan at a doctor's appointment. Ex. 4( c). Pascual told him [Vélez] but "he didn't tell me it was for today." Vélez-Class clarified that "[Pascual] doesn't know I am here today." Bosques then offers that the narcotics transactions "may be tomorrow or the day after." Ex. 4( c) p. 3. Vélez-Class reiterates that: "Because Pascual spoke with me . . .  Pascual spoke with me, the thing is that I am not over there at work." Ex. 4( c) id.

At Exhibit 4(d) Bosques speaks with Santiago and informs that Vélez is not in Mayaguez because "Vélez is in San Juan." Santiago then offers to speak to co-defendant Bey. Santiago states "and how about Bey, is he in the division . . .call Bey he should be

there." Ex. 4(d) p. 1. Bosques calls subsequently Bey. See Ex. 4(e). Bey agrees to check if there is availability of a couple of bags of grass and cocaine. Specifically Bosques asks for a "couple of bags of grass and a couple of coke." Bey says "alright, I'll check over there to see if there is some." Ex. 4(e).[8]

However, when Bosques arrives at the drug division of the police precinct, fully wired to continue gathering evidence, the person that ultimately delivers to him the drugs is co-defendant Anthony Domínguez. The court briefly explains. Bosques was wired when he arrived at the drug division precinct and asks to speak to Domínguez, "listen to me for a second I am coming to give confidential information to Domínguez. I need you to leave me alone to speak with Anthony Domínguez." Ex. 4(g) p. 6. Later Bosques asks Domínguez: "What do you have, what's that. A couple of bags more? A couple of coke? Domínguez agrees and answers the request "all right." Ex. 4(g) p. 10. Moreover, Domínguez recognizes that prior thereto he had spoken to co-defendant Bey. "That's what I told Bey."[9]

Finally, Domínguez asks Bosques "are you wired up, you mother fucker, because you're making some fucking questions." Bosques changes the subject "let me take my vest because there's no need for me to be here. We'll talk later." Ex. 4(g) p. 14.

Co-defendant Domínguez was also the subject of testimony as to a drug transaction wherein he participated with co-defendant Cortes Caban and Luis Ruperto Torres in the

---

[8]     Co-defendant Efrain Bey Arce  was found not guilty as to both of the conspiracy counts.

[9]     The fact that Domínguez was able to produce the drug notwithstanding that Pascual Santiago Méndez was not in the police precinct nor was Luis Vélez Class, who both had at one time the control of the black box leads the court to the inescapable conclusion that the possession of the drug was "joint" in nature. Bey also never expressed any doubts on this same day in producing the drug notwithstanding the absence of Pascual Santiago Méndez and Luis Vélez Class, both of whom normally had possession of the "black box" at the drug division precinct.

fabrication of evidence against one W.H.P., victim/witness Wilfredo Enriquez Pérez, who testified in court as to his arrest without any cause and the fabrication of evidence by the planting of evidence. A lawyer, named José H. Marti Fajardo, aka "Pita," friend and neighbor of the W.H.P., testified that he witnessed the arrest and saw that the victim was never searched and no drugs being found on him. Later "Pita" was called by the victim's wife to visit the drug division as her husband had been arrested and found with drugs in his possession.

Although the incident was subject to strenuous cross examination "the trial judge must resolve all evidentiary conflicts and credibility questions in the prosecution's favor . . ." United States v. Olvres, 61 F.3d at 920 unless the testimony is "unreasonable, unsupportable or speculative . . . " United States v. Ofray-Campos, 534 F.3d 1, 31-32 (2nd Cir. 2008).

The presumption of dangerousness applies to the defendant in the instant case by express disposition of United States v. Abuhamra, 389 F.3d at 320 citing Jones v. United States, 463 U.S. at 364. "**The fact that a person has been found beyond a reasonable doubt to have committed a criminal act certainly indicates dangerousness."**

The violation of civil rights is a felony constituting a criminal act meaning that pursuant to United States v. Abuhamra, Id., and pursuant to United States v. Bayko, 884 F.2d at 521, the accused must then satisfy the burden "by clear and convincing evidence" signifying "substantial evidence" under United States v. Abuhamra, Id., that he is not a danger to the community. "The defendant has the burden of showing by "clear and convincing evidence" that he or she will not be a danger to the community." Bayko, Id.; "it

17

requires the defendant to carry the burden by  clear and convincing evidence. Not by mere preponderance. Only if a defendant clears these high procedural hurdles is he entitled to release pending sentencing."  United States v. Abuhamra, Id.

The court finds that defendant Domínguez falls short of the threshold mark as to the civil rights conspiracy conviction. First, he threatened the government's principal witness, cooperator co-defendant Josue Bosques, which initially did not impress the witness, but Josue Bosques had at that time not yet been revealed to the co-defendants as the principal cooperator. Further, the government also presented as witnesses other cooperators who were also policemen, co-defendant Dennis Muñiz-Tirado and co-defendant Luis Vélez-Class.  Revealing the cooperators to the defendants and the specific cooperation of each, places these co-defendants, who are not detained, in danger should the defendants be released.

Defendants further argue that they have been stripped of power and hence they do not represent danger. The court disagrees. Taking the argument to its logical consequence, should the crime have been committed with an assigned police weapon, even to the point of killing a victim, the policeman does not loose his dangerousness presumption by the fact that he no longer has possession of the assigned weapon. The danger is not eradicated by the loss of the trust position. Further, the reasons provided by defendant simply do not reach the "high procedural hurdles" of "clear and convincing evidence" required under Abuhamra and Bayko, Id.

Persons convicted in positions of trust of fabricating civil rights using drugs (even

18

though possession with intent to distribute may not be proven[10]) present to the undersigned federal judge an example of a clear convincing case where "the government's regulatory interest in community safety can, in appropriate circumstances, outweigh [the] liberty interest." United States v. Abuhamra, 389 F.3d at 320 citing United States v. Salermo, 481 U.S. 738 at 748 (1987). Further as found in the policy statement of the Bail Reform Act set forth in United States v. Abuhamra, Id., granting bail to a policeman who fabricates evidence that causes the incarceration of a victim, "release of [that particular] criminal defendant into the community after conviction may undermine the deterrent effect of the criminal law" citing United States v. Shoffner, 791 F.2d 586, 589 (7th Cir. 1986). The bail as to Anthony Domínguez is, therefore, DENIED.

B. Víctor Cortes-Caban

Co-defendant Víctor Cortes-Caban has filed a Rule 29 Motion and a Motion to Dismiss challenging the sufficiency as to the count relating to the drug conspiracy. The Rule 29 was timely filed after the government terminated its case in chief and after the end of trial.  As of this date, the court has not provided a final determination as the co-defendant's motion and has to this date not been resolved. The court differs as stated herein but has not made a final determination on the matter.  The court for arguments sake grants that the drug conspiracy only, pursuant to United States v. Bayko, 774 F.2d 523, "the matter is close or one that very well could be decided the other way" citing United

---

[10]    But it is unquestionable that the drugs in the black box were in fact drugs, as the drugs were chemically analyzed and found to be marihuana, cocaine hydrochloride, cocaine base (crack), heroin, as testified by Chemist Peter E. Echevarri, Tr. Dec. 11, 2008. Hence, even though possession with intent to distribute may not have been proven, it is unquestionable that the fabrication of civil rights was facilitated and performed with the use of drugs.

States v. Giancola, 754 F.2d at 901. The same argument was made in a Motion to Dismiss at Docket 362 which the court from the bench denied using the same reasoning as expressed at p. 13 to 14 of this order in the section of analysis as to co-defendant Anthony Domínguez Colón supra. Co-defendant also requested bail, at the reconsideration bail hearing, with more stringent conditions including house arrest and his sister acting as third party custodian. [11]

The incriminating facts as to co-defendant Víctor Cortes Caban relating to the count as to violation of civil rights are relatively simple. He confessed twice and on each occasion he signed a document entitled Advice of Rights. See Exs. 18 and 19. Specifically, FBI agents waited for co-defendant Cortes Caban to exit the court house in Aguadilla, Puerto Rico, and in the parking lot of the court house, the FBI agents, informed him that he had just fabricated a criminal case by signing a false affidavit related to a search and seizure. He followed the FBI agents to the FBI car wherein he signed at 4:23 p.m. on July 17, 2007 a document recognizing that he had been duly forewarned as to his rights under Miranda vs. Arizona, 384 U.S. 436, 444 (1966). Defendant Cortes Caban began to confess by accepting his signing of the false affidavit. He then proceeded to request the FBI officers to move the automobile, where he was with the FBI agents, to another location as he did not want to be seen in the car with the FBI agents in the parking lot of the court house. The FBI automobile proceeded to another parking lot across the street from the court house parking lot used by a small shopping center. Once location of the automobile was changed,

---

[11]    Counsel for Cortes-Cabán, attorney Ramón García, was the first to argue that the drug conspiracy as charged failed to pass muster. Although the court disagrees, the court recognizes the matter to be one of first impression that is "close" to the point of potentially being decided "the other way" pursuant to United States v. Bayko, 774 F.2d at 522-523.

Cortes Cabán continued to confess and fully accepted providing further information as to his participation in the false statement used to arrest a citizen. He agreed to return and later meet the FBI agents. Most critical, on yet another day, he voluntarily returned to the FBI facilities in Aguadilla, PR, on July 21, 2007. He again signed another document entitled Advice of Rights at 8:45 a.m. at the FBI offices before the interrogation of him was resumed. The FBI agent was Julio Tovar, who testified as to the events of July 17 and July 21, 2007. Julio Tovar explained that he could not recall specifically how the defendant arrived on the second day but that standard procedure was that the person is driven to known location, and is picked up and from there driven by FBI agents to the FBI offices. The court first determined the admissibility of the confession on a hearing away from the jury on December 10, 2008, making specific findings to determine the surrounding circumstances as to a voluntary, knowing and intelligent waiver of rights associated with the Miranda standards and the voluntariness and non coercitive nature of the confession.[12] See generally Sims v. State of Georgia, 385 U.S. 538, 543-544 (1967); Jackson v. Denno, 378 U.S. 368, 376-377 (1964); Pinto v. Pierce, 389 U.S. 31, 33 (1967).

In addition to co-defendant Domínguez accepting his providing a false sworn statement used in a search warrant, defendant also participated in the arrest of W.H.P., Wilfredo Enriquez Pérez, [also spelled as Henriquez] a victim who was illegally detained by several policemen including Anthony Domínguez, Ruperto Torres and Víctor Cortes Caban. See discussion infra in the section of analysis as to co-defendant Anthony Domínguez Colón (supra) and co-defendant Luis Ruperto Torres (infra).

---

[12]     The factual findings and conclusions as to the voluntary and non coercive nature of the confession of the co-defendant can be found at the Transcript of December 10, 2008.

21

Víctor Cortes Caban further participated in a police intervention at El Carmen and Candelaria Public Housing Facility. As stated before, certain individuals were stopped for the purpose of accepting drug dependency allegedly only to receive drug treatment. But in reality, they were later carried in the police books of the precinct as arrested persons for the purposes of satisfying police quota arrests for drug crimes. (See discussion infra in the analysis as to co-defendant Luis Ruperto Torres.)

The court finds that the proffer of the defendant as to reasons for granting bail does not reach the threshold burden of showing by "clear and convincing evidence" that he is not a "danger to the community" as a policeman who has been duly convicted of a crime carries the rebuttable "dangerousness" presumption. United States v. Abuhamra, 389 U.S. at 320; United States v. Bayko, 774 F.2d 521, referring to the statute at 18 U.S.C. 3143(b). The Court reiterates that there are three co-defendant policemen who testified who are potential subjects of the dangerousness of the defendants as the court must provide "appropriate recognition to the danger a person may pose to other if released." United States v. Abuhamra, Id. citing the Congressional history of the Bail Reform Act of 1984 at S. Rep. 225 at 26 reprinted at 1984, U.S. Code Cong. and Administrative News at 3185. The court reiterates the words of the U.S. Attorney opposing bail at reconsideration hearing that the policeman currently seeking bail precisely "victimized the persons whom they were attempting to protect." The court understands that these policemen who were found to be in a conspiracy to fabricate evidence using drugs have of course a liberty interest but the court is of the opinion that it is outweighed by the "strong and obvious countervailing interest in detaining the [former police] defendants who have been found guilty beyond a

22

reasonable doubt of serious crimes [conspiracy to fabricate criminal cases in violation of civil rights], such detention promotes public safety by removing a presumptively dangerous person from the community; it also encourages general respect for the law by signaling that a guilty person will not be able to avoid or delay imposition and service of the sentence prescribed by the law." United States  v. Abuhamra, 389 F.3d at 320.

The court incorporates the reasoning also provided as to co-defendant Anthony Domínguez Colón in that the instant case presents a proper example of the "government's regulatory interest in community safety . . . outweigh[ing] the liberty interest [of the defendant], United States v. Salerno, 481 U.S. at 748, and that "release of a criminal defendant into the community after conviction undermine[s] the deterrent effect of criminal law." United States v. Abuhamra, Id. citing United States v. Shoffner, 791 F.2d at 589.

The bail as to co-defendant Víctor Cortes Caban is DENIED.

C. Pascual Santiago Méndez

At the reconsideration of bail hearing, co-defendant Pascual Santiago through counsel suggested that his bail could be increased; he stressed his strong community ties; he also emphasized his prior no violent conduct and that he no longer represents a danger because he no longer is a policeman nor does he possess a weapon.

Similarly to the other co-defendants, although the court is of the opinion that the drug conspiracy was fully proven specially as to Pascual Santiago, since he had obviously joint possession of the black box containing drugs and from there he personally distributed and/or authorized the distribution of the drugs located at the black box to other policemen, the court grants for arguments sake that the question is "close," pursuant to United States

v. Bayko, 774 F.2d 23.

The court, therefore, proceeds to analyze his participation in the scheme relating to Count I, the violation of civil rights. First, he is the person who had the control of the black box containing the drugs that were used to fabricate criminal cases in violation of the due process of the victims in the Mayaguez-Arecibo area. He is further facing a potential enhancement as leader/organizer under the advisory guidelines and/or under 18 U.S.C. 3553. Pascual Santiago also quarterbacks the distribution of drugs to violate the civil rights of the neighbors of Bosques "driving him nuts," see Ex. 4(a)-(g). Pascual Santiago plans through recorded phone calls the logistics through which Bosques is to receive the drug that is to be planted to the neighbors of Bosques who were "driving him nuts." The logistics of the management of producing the drugs to Bosques is performed by Pascual Santiago who is not in the precinct on that day and solicits Vélez Class to deliver the drugs to Bosques. However, Vélez Class was at a doctor's appointment with his wife in San Juan and, hence, Bosques calls again Pascual Santiago and he suggested the help of co-defendant Efrain Bey-Arce. Ex. 4(d). Bey Arce agreed to deliver drugs, should the drugs be available there. Bosques requested "a couple of bags of grass and a couple of cocaine." Bey stated that "I'll check over there to see if there is some."  It is thus unquestionable that they are talking about narcotics. Actually it was co-defendant Domínguez who delivered the drugs as Bey Arce called Bosques (unrecorded), as per the testimony of Bosques, that it would be co-defendant Anthony Domínguez Colón who would deliver the drugs to Bosques. In fact, Domínguez actually delivered the drugs to Bosques as confirmed by the audio recorded phone calls (Ex. 4 (a)-(g). However, the person who throughout planned

the logistics of the distribution of drugs to perform the fabrication at least from Vélez Class to Bey-Arce was Pascual Santiago. Pascual Santiago was undoubtedly, pursuant to the audio tape played, involved in the plan to provide drugs to fabricate a case against the neighbors of Bosques then "driven him nuts."

Pascual Santiago was also intimately and directly involved in the fabrication of evidence using drugs as to victim OSL one surnamed Pichi that occurred at Barrio Maní meaning that her civil rights were violated via a trampling of her civil rights violations. The drug was on this occasion in possession of Pascual Santiago delivered to Vélez Class all with the intention to be planted to OLS alias Pichi. The evidence was essentially produced as indicated in overt act "C" of count one except that Vélez Class was not specifically included in the overt act as a participating member.

Finally, three days after the FBI searched the Mayaguez Drug Division precinct and found the black box, Pascual Santiago Méndez organized a meeting in Bayamón, among co-defendants at a restaurant located at Rio Hondo Shopping Center with the purpose to further fabricate false evidence. The purpose was to spoliate evidence by a cover-up to offset the legal effect of the black box found by the FBI in the drug division of a precinct in Mayaguez. A sworn statement was to be produced in an attempt to legalize the black box by connecting the black box to a genuine pending narcotic criminal cases. The ultimate effect was to continue the secrecy and the existence of the conspiracy.  (See discussion infra in the legal analysis section as to Luis Ruperto Torres.)

Again, we must conclude, as was the case as to co-defendants Domínguez and Cortes Cabán, that co-defendant Pascual Santiago Méndez also has failed to rebut the

presumption as to dangerousness. That is, he has failed to rebut the presumption as to Count I, the civil rights conspiracy, by "clear and convincing evidence" that he is not a danger to any other person or to the community. The court in order to avoid repetition incorporates the analysis of the court, infra, as to Domínguez and Cortes Cabán stated herein. The bail as to co-defendant Pascual Santiago Méndez is, therefore, DENIED.[13]

### D. Luis Ruperto Torres

Counsel for Luis Ruperto Torres stressed at the reconsideration hearing defendant's long years of good service with an unblemished record.[14]   Counsel spoke vehemently as to "not a single [criminal] record." Counsel further argued that defendant did not pose a flight risk or a danger to the community. Counsel  urged at the hearing the granting of bail with home detention and an electronic device.

The United States responded that this particular defendant was involved in the fabrication of evidence of Wilfredo Enriquez Pérez, (sometimes spelled as Henriquez), Urbanization, Rio Cristal on July 10, 2007, Torres was also involved, on a later different date, riding in the same unmarked car with Josue Bosques Muñiz when two cars went to El Carmen and Candelaria Public Housing Development on July 12, 2007, in order to fabricate drug cases. Co-defendant Cortes Caban was also present on this July 12 2007 date in another unmarked car at Public Dwelling Carmen/Candelaria. The incidents of July

---

[13]     Although the court accepts potential "close question" under <u>Bayko</u> as to a legal issue that may be decided "the other way," as to the narcotics conspiracy, subject to the court's caveat, the court does not find a close question as to the civil rights conspiracy violation. The matter is further discussed infra.

[14]     But defendant's own words as depicted in the video tapes demonstrate that he had, prior to being transferred to Mayaguez, a strong reiterated proclivity to fabricate cases in violation of civil rights. See discussion infra.

12, 2007 were video/audio recorded by Josue Bosques. (Ex. 11 Transcript; Ex. 11 video.)

There is no doubt and it was irrefutable that Luis Ruperto Torres, hereinafter referred to as Ruperto Torres, was present with Jose Bosques at the car on the early morning hours, since Bosques identified him as being in the car and the transcript, as they left the police station, reflects that the unmarked car had the rear mirror broker. Ruperto Torres suggest some sort of glue/tape to be used to fix the rear view mirror.

Bosques:     That rear view mirror is broken. That rear view mirror is broken dude.

L R:          Glue there.

Bosques:     Well tape it really well. (Ex. 11 p. 5).

Further, it is Ruperto Torres that decides the logistics as to how to get into the Public Housing Development relating to the police drug operation of this date:

Bosques:     Ruper, how we are doing this.

L R:          We're going to come in through the school.

Bosques:     Alright but we're going where. To El Carmen and Candelaria?

L R:          To El Carmen and Candelaria.

Bosques:     Okay.

Ruperto Torres also determines on this date the numbers of arrests that are needed.

Bosques:     Ruper you, have the numbers, what are we going to do.

L R:          Huh?

27

Bosques:       How many arrests.

L R:              Around eight.

Bosques:       Eight arrests.

L R:              Eight.  (Ex. 11 p. 7.)

Further, as the highest ranking officer [Sargent], in the operation at El Camen/Candelaria Housing Dwelling, Ruperto Torres (L.R. in the transcript, Luis Torres) is the person in charge and directs the safe entry into the Public Housing Development on this date.

L.R.             You two go in through– explain to him, for both of them to go in through Kennedy and we– we will come in through the school over here [referring to the unmarked car of Luis Ruperto Torres and Josue Bosques Muñiz).

(Ex. 11 p. 8.)

Bosques:       There's a problem of distance. Tell him [speaking to Luis Ruperto Torres].

L R:              Danny will come in through the, through the court, through the handball court, what's called the fish bowl, ah and Cortés will come in through el Palito. I'll come in through the school and we'll catch them there. Go ahead, I'll give you a break until you arrive . . .

L R:              We're coming in through this one. (Ex. 11 p. 9.)

Luis Ruperto identifies a target.

28

L R:            Look at them there  . . . look at them there . . .  I'll go through the
                back.

As the tape was payed to the jury, Josue Bosques explained and testified
simultaneously that he had been authorized by the FBI to obtain evidence in this date
about the fabrication of drug cases. "Also– that day I was– I was to obtain evidence as to
statistics, about drug users to take their names with the only purpose of statistics." (D. 398
p. 7.) The problem was that Bosques testified that at the field in El Carmen/Candelaria the
names were taken and the victims were advised that their names were taken only for
helping them to receive drug treatment but in reality they were charged with a drug offense
to satisfy a number of quota of arrests.

Q:      So did you take personal information from individuals you did not arrest.

A:      [Bosques] that is correct.

Q:      Are you aware whether any of your colleagues, particularly Victor Cortés or
        Ruperto Torres, did they take personal information of individuals who were
        not arrested?

A:      That is correct. (D. 398, p. 29.)

Q:      Did you witness Luis Ruperto or Victor Cortés obtaining the personal
        information of individuals not arrested?

A:      I was able to observe Victor Cortés. (D. 398 p. 32.)

But although Bosques did not observe co-defendant Luis Ruperto, the instant civil
rights count did not constitute substantive offense of civil rights violation but a conspiracy

29

to violate civil rights. Luis Ruperto Torres was there, he lead the operation, the operation was to fulfill a quota of drug arrests fabricating evidence, and ultimately later the plan called for the fabrication of evidence at the police precinct. Further, Luis Ruperto Torres was not merely present, he was leading the operation and knows exactly the purpose.

The procedure used was the following as testified by Bosques Muñiz:

A:      They would use a name– They were drug users[;] we would say that we were going to take them into a program, a rehab program. But you didn't really do that and you just took information and let the person go and after that, you justify those arrests illegally with controlled substances. (D. 398 p. 37.)

Q:      With respect to those individuals whose information you took during this operation, how did you fabricate cases involving these individuals.

A:      With the names of those innocents that were arrested.

Mr. Nogueras: Objection.

The court:      Sustained. [foundation] Did that actually take place, or are you stating that this was already done. The court wants an answer from you as to those three individuals.

A:      That is correct. Their names were taken and then afterwards, at the division [precinct] evidence was fabricated.

Q:      [By AUSA, Anderson]:

A:      In my personal case agent Victor Cortés gave the drugs to me.

Q:      And you went and made the arrest.

30

A:    [Bosques] the information the data was taken, but the person was set free, [they] were let go.

Q:    [The court] But the key question was, were they subsequently– were they subsequently the subject of a fabrication.

A:    That's correct.

Q:    [The court] And what is your foundation for that.

A:    **The instruction of the Sargent Ruperto Torres to get statistics that had to be without [sic] [short of]– statistics which we had to justify**. (Emphasis ours.)

The court:    But the question is, did you have personal knowledge for the subsequent arrests that were made of those three individuals.

A:    . . . but none, except the one arrested by Miguel Hernández, had controlled substances.[15]

Mr. Nogueras:    Your honor, I move to strike anything that he stated related to something he does not know.

Mr. Anderson:    I'm going to clarify it right now.

The court:    Okay fine. So please be aware that you are on the brink of Niagara Falls on this one [referring to the two arrest who the witness lacked personal knowledge].

---

[15]    Miguel Hernández delivered the drug to him at the intervention and it appeared in the camera. This was a legitimate arrest intervention.

31

Q. By Mr. Anderson:

You have already stated– we saw [in the video] the one person being arrested, actually a person being arrested and brought to the cuartel, right? [a person seen several time wearing a band on his head]

A:     That's correct.

Q:     Was anyone else that we see in the video physically taken into custody and brought to the cuartel?

A:     No sir.

Q:     The information that you took from them, we heard it, their names, what happened with that information?

A:     You put that information into the novelty book, registry, and then we have to justify why that person is placed there.

[repeated question at the request of Mr. Nogueras]

Q:     The person were never arrested.

A:     That's correct.

Q:     But paperwork was completed as though the person was arrested, correct?

A:     That is correct. (D. 398 p. 41-45.)

There is, however, important circumstantial evidence, aside from the testimony of Bosques stated above as to Luis Ruperto Torres' knowledge of the operations to fabricate evidence. That is, that Ruperto Torres openly lauded Bosques in the video by referring to

Bosques as the "mass destruction machine" during the police's drug operation of the civil rights fabrication of evidence incidents occurring at the Candelaria Housing Projects. The lauding comment as to Bosques occurred after the first operation on this date, but prior to moving to another housing projects. Here Luis Ruperto Torres admits openly that he also fabricated cases by referring to himself as the "drunkards mass destruction machine."

L R:    The man is fucking too much. [referring to Bosques]

Bosques:    I am going to tell you one thing, just one thing I will tell you Rupert– I returned from vacation.

L R:    You're in zero you fag (referring to zero arrests).

Bosques:    I am in zero. I'm in zero in everything.

L R:    You must rank yourself with a couple of searches, in order for you to continue being on the top. As soon as you return from – this is your month. As soon as you return from vacation, Agent of the Month. So they say, and with the **mass destruction machine**, this had to come. (Emphasis ours.)

L R:    And in half, in half of the month– [the facts were occurring on July 12, 2007] for him to become agent, that is because he is a machine.

Bosques:    Let me see how I can tell you. To your– to please you– how many arrests do you want?

L R:    Today?

Bosques:    Today.

L R:    No, no we'll– we'll– go with two or three arre..with those that are already

there, a couple more and that's it.

Bosques:       But how much is the quota?

L R:    About 15 . . .  (D. 11 p. 32-34.)

In the above reproduction of transcript, Ruperto Torres thus clearly admits that there was a quota to be satisfied aside from the actual number of arrests. Through the interchange the jury could have made a reasonable inference, specifically as to Bosques being referred to a "mass destruction machine" by Ruperto Torres, who referred immediately thereafter as to himself as being the "**drunkards machine destruction machine**." Ex. 11 p. 40, Emphasis ours. Ruperto Torres bragged that, while assigned to the Puerto Nuevo Police precinct, he fabricated cases against drunkards by having then blow in a machine and then placing another name.

L R:    I was the **drunkards mass destruction machine**. In Puerto Nuevo, the drunkards don't hate anyone else more than me. (Emphasis ours.)

Bosques:       Why.

L R:    That was 20/20, dude just like that [UI]. You don't want to blow/ There's no problem at all [U.I.]. Come here dude, dude blow here– dude, you came out with twenty some. [laughs] You're scr– you're screwed.

Bosques:       How come?

L R:    Huh? I would put another one of the ones there to blow. I wouldn't get screwed for one.

Bosques:       Listerine.

34

L R:    With Listerine?

Bosques:      It works?

L R:    You take– you take the drunks who are there waiting– you tell them, "come
        here dude, blow in here, to see if may leave."

Bosques:      You're kidding!

L R:    **And you put someone else's name**. [laughs] (Emphasis ours.)  "Let's
        leave, that" [laughs] (Ex. 11 p. 40-41.)

The above interchange clearly places into focus the subject of the "mass destruction
machine" pseudonym compared to "drunkards mass destruction machine" for the jury to
make a reasonable inference as to why Luis Ruperto Torres refers to Bosques as to "mass
destruction machine" immediately after the first intervention as to the beginnings of a drug
fabrication case. To be compared with the "drunkards mass destruction machine" wherein
Luis Ruperto Torres attributes that pseudonym to himself. By his own testimony, as
contained in the video of July 12, 2007, the reputation of co-defendant Luis Ruperto Torres
has been seriously tarnished and counsel's insistence as to his "excellent reputation and
good conduct" crumbles, as a sand castle yields to incoming beach waves.

Further, the analogy based on Ruperto Torres own testimony of Bosques being a
"mass destruction machine" immediately after the beginnings of fabrication at the
Candelaria Housing Projects operation, and to himself as the "drunkards mass destruction
machine" both titles as to "mass destruction machine," obviously referring to the fabrication
of criminal evidence in violation of victims' civil rights. Hence, the jury could infer that

35

Ruperto Torres knew very well what Bosques was doing at Candelaria Housing Project when he referred to him as the "mass destruction machine" and compared Bosques to himself when he fabricated evidence at Puerto Nuevo against drunkards, naming himself the "drunkards mass destruction machine."

Finally, on this date July 12, 2007, Luis Ruperto Torres admits that he participated in the incident of the arrest of Flaco, at Rio Cristal Urbanization, on July 10, 2007. Flaco being Wilfredo Enriquez Pérez. The facts can be corroborated by the transcript p. 44-47 of Ex. 11. Luis Ruperto Torres asks to go to Gandara section.

L R:    Better go to Gandara.

Then Bosques suggest to la Chorra.

Bosques:    To la Chorra. (Ex. 11 p. 45.)

Finally, Luis Ruperto Torres states that "tell them to wait for me there, that I am **going to go by Pita's for a moment**." (Emphasis ours.)

Ruperto Torres therefore determines to move his unmarked car to Pita's (referring to Counsel of W.H.P., Martí Fajardo).

Bosques asks        "what's Pita home? [correction from "Tita" to "Pita," at the transcript, is authorized and explained at Docket No. 398 p. 98-99] [Pita, José H. Martí Fajardo, was counsel for Enriquez (also spelled as Henriquez).

Luis Ruperto Torres then states "we ran out to the back, right?" The jury could infer that this was referring to the running to chase Enriquez when he was arrested as testified

by victim Enriquez (sometimes spelled as Henriquez).

Bosques then asks  "Oh, but the intervention took place here?

Ruperto Torres then says:  "Yes and then ah– we came all the way here." (D.11 p. 45.)

Suddenly, Ruperto Torres says "look at Flaco, where we arrested him." Bosques then asks "which one." Ruperto Torres answers [UI]. Bosques says "that one is Flaco." Luis Ruperto Torres finally says "Yes" . . . Bosques asks "are you sure." Torres says "yes" and later repeats "look, here's the guy we arrested." (D. 11 p. 46.)

Counsel Nogueras alleges that "we" when referring to "we arrested him"; "we ran out the back" and "we all came all the way" does not refer to Luis Ruperto Torres participating in the conspiracy to arrest Enriquez leading later to the fabrication of evidence. The problem is that the inferences are left to the jury to determine what "we meant." After the jury renders a verdict the court must examine the evidence "in the light must flattering to the government and taking all reasonable inferences in its favor." United States v. O'Brien, 14 F.3d at 706.  "In the light most favorable to the government" means that "we" means Luis Ruperto Torres and others who arrested Wilfredo Enriquez Pérez. Hence, the defendant that has been found guilty of a felony must prove under Section 3143  "by clear and convincing evidence" that he does not present a danger to the community.

For the reasons set forth as to co-defendants Anthony Domínguez, Victor Cabán, and Pascual Santiago Méndez, the court denies bail as to co-defendant Luis Ruperto Torres. However, the court must also examine whether or not defendant has presented a legal issue under United States v. Bayko, 774 F.2d 522-523 as to a "substantial question

37

of law or fact" constituting a "close" question or one that very well "could be decided the other way."

The court briefly discusses some of the legal issues raised by co-defendant Luis Ruperto Torres and other co-defendants.

Legal Issues as to Luis Ruperto Torres

1. Inconsistent verdict

Luis Ruperto Torres alleged that the civil rights count should be dismissed as the fabrication was utilizing drugs and he was exonerated as to the possession with intent to distribute drug conspiracy. He is, hence, alleging dismissal due to an inconsistent verdict.

In the first instant, once again the court emphasizes that in this case as to the civil rights count the charged crime constitutes a conspiracy that is a "plan" to violate civil rights, the underlying crime is a civil rights violation not a drug violation case. Hence, the defendant's plan could have very well included use of drugs without having himself criminally actually possessed the drugs with intent to distribute.

Second, and most critical in the First Circuit jurisdiction, inconsistent verdicts are "non reviewable." United States v. Figueroa Encarnación, 343 F. 3d 23, 29 Fn. 3 (1st Cir. 2003) (Torruellas C. J.)

> Under United States v. Powell, 469 U.S. 57, 105 S. Ct. 471, 83 L.Ed.2d 461 (1984) and Dunn v. United States, 284 U.S. 390, 52 S. Ct. 189, 76 L.Ed. 356 (1932), a "claim that the jury verdict is internally inconsistent" is "essentially unreviewable." United States v. Alicea, 205 F.3d 480, 484 (1st Cir. 2000).

In Figueroa Encarnación, supra, the specific holding, the issue under scrutiny was

whether "a defendant may be convicted for possession of a weapon in furtherance of a [drug] trafficking crime [of a weapons crime] under § 924( c), even if he is acquitted under the drug possession crime." Figueroa Encarnación, Id.  That is, whether you could be guilty of having a weapon on a drug **trafficking crime or violent crime,** notwithstanding that you were found innocent of the separate drug trafficking crime or a violent crime associated with the weapons charge. The court squarely determined that "we join several of our sister circuits in holding that a defendant may be convicted for possession of a weapon [used during a drug trafficking crime or the specific violent crime] . . . even if the defendant is acquitted of the underlying drug possession case . . ." Figueroa Encarnación, Id. The court relied on the Supreme Court cases of United States v. Powell, 469 U.S. 57, 105 S. Ct. 471, 83 L.Ed.2d 461 (1984) and Dunn v. United States, 284 U.S. 390, 52 S. Ct. 189, 76 L.Ed. 356 (1932) and on the brief analysis at 343 F.3d 30 Fn. 4, which essentially holds that the determining factor, is whether in the count that there is a conviction "there is sufficient evidence to 'sustain a rational verdict of guilty beyond a reasonable doubt'." United States v. López, 944 F.2d 33, 41 (1st Cir. 1991). As explained above there was plenty of evidence as to the satisfaction of guilt relating to co-defendant Luis Ruperto Torres as to the civil rights conspiracy to violate civil rights, although he was found innocent on the count of conspiracy to possess with intent to distribute drugs.

The court does not consider this legal issue "close" that may very well be decided "the other way" under United States v. Bayko, 774 F.2d at 523 since the First Circuit has squarely decided the issue contrary to defendant's contention.

2. The admittance into evidence based on judicial notice of disciplinary decisions

of Supreme Court of Puerto Rico, as a potential impeachment to counsel Martí Fajardo request made several days after the witness finished testifying and noticed to the court immediately before closing argument.

José Pita Martí Fajardo, a lawyer testified as a neighbor of WHP, Wilfredo Enriquez Pérez (sometimes spelled Henriquez),  as to the fact that he saw when his neighbor was arrested and was not searched at all by the police. (D. 399 p. 207.) Pita Martí was barely several feet from him as he lived directly across the street from where he was searched. D. 399 p. 205, (less than the length of the court room, more than the width).[16] He confessed as to being disbarred once by the Supreme Court, and further accepted that the disbarment was indefinite although he was reinstated one year thereafter.

"Well the suspension was indefinite . . . " (D. 399 p. 215). [prior to that he stated] "I was suspended since April 31, 2005 up to the 19th of April of 2006. Id.

After the witness testified and was excused by the court on 10th December 2008, and after Mr. Nogueras was asked whether or not he was to cross examine the witness, counsel Nogueras answered "I could but I won't" (D. 399 p. 217.). The court had then to determine whether to admit into evidence two disciplinary measures issued against counsel Martí

---

[16]   "I resided right across from where this gentlemen Wilfredo lived . . ." [separate question asked]. " Well his arrest was 10 feet from the staircase to where he lived." (D. 399 p. 204.)

Q: Did you at any time see the agent find drugs on Mr. Enriquez.
A:  Not in my presence. (D. 399, p. 211.)
Q: Did you ever see Mr. Henriquez Pérez searched?
A: No. (D 399, p. 207.)
Q: And what did you argue with agent Domínguez about? [referring to at the precinct not later at the court].
A: Well, I started arguing, I got upset because I learned that supposedly drugs had been found on him. (D. 399, p. 212.)

Fajardo, the witness, one of which was dated in 1983, that is, over twenty-five years old. That is, counsel Nogueras filed a motion on December 12, 2008, requesting the court to take judicial notice of two disciplinary decisions of the Supreme Court as to Pita Martí. The court was alerted as to the filing of the motions on December 17, 2008 when the court held four days thereafter  an extensive charge conference, two days before final arguments, (Docket 409), wherein all counsel agreed as to the instructions. (D 417, p. 1-27, see also Minutes as to another charge conference held immediately before final argument, (D. 418).

The position of the United States was that if witness was to be crossed examined with a document, notwithstanding the document being admitted per-se as a legal document, the cross on the document should have taken place at the time the witness was on the witness stand enabling him to potentially explain circumstances or facts as to the document. (D. 416 p. 5.)

Counsel   for  defendant stated unequivocally that in the documents he was attempting to admit in evidence "it [sic] [referring to the witness] was called **immoral or untruthful**." (D. 416 p. 6.) (Emphasis ours.)

The court prefers to analyze each discipline document from the Puerto Rico Supreme Court separately.

Although the burden of translation belongs to defendant who must translate the documents under court review, the court has read the documents in Spanish and performs an independent analysis as to each document. (See attachment to D. 418, two Supreme Court's opinions as to counsel Martí Fajardo.)

Witness José H. Martí Fajardo was disciplined on February 3, 1983 for purely a

41

notarial problem. In that decision the court clearly expressed that the Director of the Notarial Inspection Office, Govern D. Suris, had moved for discipline action based on notarial deficiencies for the years 1981-1982.  Based on counsel Martí Fajardo, Fajardo's failure to answer the request as to notarial inspection, the Supreme Court suspended him for thirty days on October 1982. He was further admonished as to why he should not be sanctioned including disbarment. Mr. Martí Fajardo was eventually disbarred, upon failure of a timely response to a prior Puerto Rico Supreme Court order to state compliance of his notarial deficiencies on February 3, 1983, all of which is the first disciplinary measure requested to be admitted into evidence. The decision provides the underlying facts, first as to suspension and then the disbarment, all motivated by the unattended notarial matter.  However, the Supreme Court, at the end of the short two-page opinion, clearly states that the court would reinstate him once counsel complied with the notarial resolution, without prejudice to the already imposed sanction. (Last sentence of the February 3, 1983 Resolution.) This discipline matter, over fifteen years old resolution is **not** related to counsel Martí's untruthful testimony under oath or even immoral conduct and, therefore, can not be simply handed over to the jury for counsel to argue;  further, it is simply too stale to be considered. (The court considers the disciplinary matter stale since even felony convictions became stale after ten years and even though over ten years convictions may be allowed, the opposing party (Mr. Nogueras) must provide reasonable prior written notice.  Moreover, the matter of impeaching the witness with the Supreme Court of Puerto Rico order would be considered classic collateral impeachment and simply excluded under Evidentiary Rule 403, because the "probative weight is substantially outweighed by the danger of unfair prejudice." (Refusal to answer an admonition to counsel by the Supreme Court on notarial

deficiencies.) Hence, the court did not allow the disciplinary measure dated February 3, 1983.

The second disciplinary measure is dated March 12, 2004. In this second disciplinary measure counsel Martí Fajardo is disbarred for "disregarding orders of the court and by legal subterfuge, obstructing and delaying procedures" before the local court trial relating to alimony to his wife and children. (First sentence of the Supreme Court opinion, translation ours.)  Pursuant to the body of the opinion, counsel did not timely answer the Supreme Court request, and abused process by unethically filing reiterated bankruptcy proceedings in an effort to delay collection of alimony debts owed to his wife and children. (The automatic stay of court actions, pursuant to federal bankruptcy law, does not apply to alimony payments.)  Counsel abused process by reiterated unethical bankruptcy filings only to delay court proceedings. Again this conduct, although reprehensible, does not constitute immoral nor untruthful testimony by counsel Martí Fajardo.

The court denied the request on two grounds. First, had it been a discipline order issued by the Puerto Rico Supreme Court for providing false testimony under both, then this court would have undoubtedly allowed the order. Further, the  argument as to the fact that the witness did not pay alimony to his wife or children before the jury could have an inflammatory evidence effect on the jury. The court also considered the reasons to impeach the witness be the argument failure to follow a Supreme Court order and/or abuse of process to be "collateral impeachment,"[17] as the testimony of the witness was related to the

---

[17]     A witness may not be impeached "on a collateral matter [the reasons for the disbarment other than providing false testimony under oath] through the use of extrinsic evidence. . .A matter is considered collateral if 'the matter itself is not relevant in the litigation to establish a fact of consequence i.e. not relevant for a purpose other than mere

fact that he observed that the "victim," Wilfredo Henriquez Pérez, had not been searched by the police officers. Moreover, and most critical, the court authorized Mr. Nogueras to argue to the jury, in any form he deemed convenient,  that the witness had admitted to have been disciplinary  disbarred for one year.  Mr. Nogueras so argued at final arguments. Moreover, the court determined that going into the specifics of the disbarment, other than for being disciplined for providing the court non collateral false testimony under oath, constituted going into the "gory details of the disbarment" excludable under R. 403 of Evidence.

The impeaching material as to the second discipline order of the Supreme Court was not as to the testimonial under oath truthfulness of  counsel Martí Fajardo's or even immoral conduct, hence, the court did not allow such testimony.  Finally, the witness, counsel Martí, was in fact duly impeached by motive and poor professional conduct, in addition to being the neighbor and counsel of the victim  plus disbarred disciplined counsel.

Finally, the matter of ruling on evidentiary matter of this nature (unfair prejudice) is a matter which falls within the sound discretion of the court (including also general evidentiary rulings). United States v. Muñoz Franco, 48 F.3d 25, 62 (1st Cir. 2007) (citing United States v. Richardson, 421 F.3d 17, 37-38 (1st Cir. 2005). See also (as to general evidentiary rulings and discretionary standard of review) United States v. Frank J. Jiménez, 419 F.3d 34, 43 (1st Cir. 2005)(the standard of review for an evidentiary ruling is abuse of

---

contradiction of the in court testimony of the witness."  United States v. Mulinelli-Navas, 111 F.3d 983, 988-989 (1st Cir. 1997).

discretion).[18]

The court does not consider this legal evidentiary issue "close" that may be very well decided "the other way" under United States v. Bayko, 774 F.2d at 523.

3. Error in not providing an instruction as to multiple conspiracies.[19]

The multiple conspiracy argument is grounded on the fact that three days after execution of the search warrant at the Mayaguez Drug Division, Pascual Santiago Méndez called for a meeting amongst some co-defendants at Rio Hondo Shopping Center in Bayamón to plan to spoliate the black box evidence having within a variety of illegal narcotics. Pascual Santiago attended together with co-defendants Luis Vélez Class, Efraín Bey Arce and  Dennis Muñiz Tirado. (D. 452 p. 33 et sec.)[20]

The court accepts that an instruction as to a second conspiracy was not provided. However, no such instruction was requested at the charge conference. In fact, as stated before,  all counsel accepted on record that the court held a charge conference attended

---

[18]  Counsel also alleged that the court " had bolstered his image" [referring to counsel Martí Fajardo] when the court asked counsel whether or not he had been disbarred on the second occasion due to a notarial incident. (D. 416 p.7-8.) The court originally thought, without the benefit of the two discipline cases against counsel Fajardo (the court did not have the benefit of the two cases as they were filed by defendant two days after the testimony was provided later) that he was disbarred as to the most recent disciplinary measure due to a notarial matter.
Q: Did you have a notarial deficiency that you didn't attend, was it?
A: No, no, it was for the complaints I did not answer.
But the fact was that prior thereto, the judge made a comment to counsel Pita Martí "they could have disbarred you but they didn't." (D. 399 p. 215.) The court only relates this matter as counsel Nogueras simply in good faith did not then have the benefit of the transcript.

[19]  Denominated by counsel Nogueras as the "second conspiracy."

[20]   The moving defendant as to the motion in limine was Luis Ruperto Torres (D. 366). He did not attend the lunch meeting. The court has not noted any other attending co-defendant to have joined the motion.

by all counsel, and AUSA (counsel Nogueras was represented by counsel Julio Cesar Alejandro Serrano who signed various motions throughout the case  and attended various conferences and participated in the selection of jury procedures). The parties reached a unanimous agreement at the charge conference to the instructions including that none would be objected, and no further instructions would be requested. The matter was unanimous to the point where one counsel, Ms. Lizarribar, in order to maintain the unanimity, accepted to withdraw certain request for an instruction, and AUSA also withdrew a request for an instruction. (See conference held in court before the charge to the court rejected inclusion of new instructions by counsel Nogueras based on the unanimity reached on the prior date as to the instructions. All counsel including Mr. Nogueras accepted that unanimity had been reached.) (Transcript, D. 417, December 18, 2008, p. 1-28, (charge to the jury also held this day immediately thereafter).  Notwithstanding no objection being filed, the matter is reviewed by the Court of Appeals on a plain error standard. United States v. Nason, 9 F.3d 155, 160-161 (1st Cir. 1993) cert. denied 510 U.S. 1207 (1994); reiterated at United States v. Shay, 57 F.3d 126, 135-136 (1st Cir. 1995).

Normally, "[t]his issue, [the legal framework if there is one overarching conspiracy or if to the contrary, there exists multiple conspiracies], assuming a properly instructed jury is [a]n issue of sufficiency of evidence issue." United States v. Soto-Beniquez, 356 F.3d 1 (1st Cir. 2004), cert. denied 541 U.S. 1074, 124 S. Ct. 2432 (2004); see also United States v. Sánchez-Badillo 540 F.3d 24, 29 (1st Cir. 2008) (citing United States v. Soto-Beniquez, Id.)

Because the court accepts that there was no instruction as to a multiple conspiracy, as no such instruction was requested, the court must examine whether there was a variance

and then, if so, whether there the "substantial rights" of the defendant were affected.  "If the evidence instead establishes agreements different from those charged, . . .the next issue is  variance. The reviewing court asks whether the evidence is sufficient to permit a properly instructed jury to convict the defendant of a similarly related conspiracy and, if so, whether the variance between the two conspiracies affected the substantial rights of the defendant." United States v. Beniquez, 356 F.3d at 18 N. 1, citing United States v. Glenn, 828 F.2d 855, 858 (1st Cir. 1987) and Kotteakos v. United States, 328 U.S. 750, 774 (1946).

Because the jury was not properly instructed as to multiple conspiracies, as opposed to a single overarching conspiracy, the court must accept that there is technically a variance.

However, even if there are two conspiracies as alleged by defendant Luis Ruperto Torres, the court finds that the "substantial rights" of the defendant were not affected as it relates to the admission of evidence as to a lunch meeting held barely three days after the black box was discovered. The court briefly explains. First, "the question whether a given body of evidence is indicative of a single [overarching] conspiracy, multiple conspiracies or [even] no conspiracy is ordinarily a matter of fact . . .  subject to review only for sufficiency of the evidence." United States v. Wihbey, United States v. Whitman, 75 F.3d 761, 774 (1st Cir. 1996) (citing United States v. David, 940 F.2d 722,732 (1st Cir.) cert. denied 502 U.S. 989 (1991).

In the instant case, as the court has followed the standard, the trial court "must take the evidence in the light most favorable to the verdict." United States v. Wihbey, Id., a case of the First Circuit involving alleged prejudice generated by evidence stemming from a

47

multiple conspiracy. The court has examined all the evidence against each co-defendant Pascual Santiago, Anthony Domínguez, Víctor Cortés Cabán and Luis Ruperto Torres and specifically has found that independent of the evidence of the attempted spoliation of evidence at the lunch meeting at Rio Hondo, there is sufficient evidence to convict each and every defendant using the standard set forth in United States v. Wihbey, Id. ". . . in the light most favorable to the government."

The second prong of the test is if there is prejudice, that is, have the substantial rights of the defendant been affected. The First Circuit has found no prejudice present should the court provide two critical instructions that were in fact provided by the court. United States v. De la Cruz, 514 F.3d 121, 139 (1st Cir. 2008).

The first instruction required under De la Cruz, Id.,  is to the effect that in a conspiracy "the defendant is not on trial in the case for participation in any conspiracy other than the one charged in the indictment, and the second [instruction] that the defendant could not be attributed guilt "based on the acts and statement of others unless those acts and statements were made by members of and in furtherance of [and during] the charged conspiracy." The jury instructions are emphasized as follows:

> "The district court in this case emphasized to the jury that Defendant could only be held accountable for the conspiracy charged in the indictment, explicitly stating that "**[t]he defendant is not on trial in this case for alleged participation in any conspiracy other than the one charged in the indictment." Trial Tr. vol. 11, Pt. 2, 126 (May 10, 2005). In addition, the jury was instructed that it could not attribute guilt to Defendant based on the acts and statements of others, unless those acts and statements were made by members of, and in furtherance of, [and during] the charged conspiracy. *Id.* at 127**. . .[Defendant's 140 claim of error thus fails because he has not established prejudice]." (Emphasis ours.)

In the instant case, as in United States v. De la Cruz, Id., the court provided the instructions which mirror the Circuit Court requirements set forth in United States v. De la Cruz, 514 F.3d at 139: Conspiracy Instruction Number 14 and Acts and Declarations of Co-conspirators Instruction Number 22. (D. 419.)

Instruction No. 14: Conspiracy, 18 U.S.C. § 371; 21 U.S.C. § 846

Defendants, **Pascual Santiago Méndez, Anthony Domínguez Colón, Víctor Cortes-Caban, Luis Ruperto Torres and Efraín Bey-Arce are accused of conspiring to commit a federal crime. It is against federal law to conspire with someone to commit this crime, the first, a crime conspiring against rights and the second conspiring to possess with intent to distribute controlled substances.** It is against law to conspire to violate the above stated federal laws.

For you to find defendants individually guilty of conspiracy, you must be convinced that the government has proven each of the following things beyond a reasonable doubt:

First, **that the agreement specified in the indictment, and not some other agreement, or agreements, existed between at least two people to violate the rights of others and/or to possess with intent to distribute controlled substances.**

Second, that the defendants individually willfully joined in that agreement.

A conspiracy is an agreement, spoken or unspoken. The conspiracy does not have to be a formal agreement or plan in which everyone sat down together and worked out all the details.

But the government must prove beyond a reasonable doubt that those who were involved shared a general understanding about the crime. Mere similarly of conduct among various people, or the fact that they may have associated with each other or discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy, but you may consider such factors.

To act "willfully" means to act voluntarily and intelligently and with the specific intent that the underlying crime be committed—that is to say, with bad purpose, either to disobey or disregard the law—not to act by ignorance, accident or mistake. The government must prove two types of intent beyond a reasonable doubt before any defendant individually can be said to have willfully joined the conspiracy: an intent to agree and an intent, whether reasonable or not, that the underlying crime be committed. Mere presence at the scene of a crime is not alone enough, but you may consider it among

49

other factors. Intent may be inferred from the surrounding circumstances.

Proof that any defendant individually willfully joined in the agreement must be based upon evidence of his/her own words and/or actions. You need not find that any defendant agreed specifically to or knew about all the details of the crime, or knew every other co- conspirator or that he participated in each act of the agreement or played a major role, but the government must prove beyond a reasonable doubt that he knew the essential features and general aims of the ventures. Even if any named defendant was not part of the agreement at the very start, he can be found guilty of conspiracy if the government proves that he willfully joined the agreement later. On the other hand, a person who has no knowledge of a conspiracy, but simply happens to act in a way that furthers some object or purpose of the conspiracy, does not thereby become a conspirator.

No overt act need be proven; should a conspiracy alleged overt acts, the government does not have to prove any of them at trial; should the government chose to prove overt acts, the government is not limited to the overt acts listed in the indictment so long as the overt acts introduced deal with conduct in furtherance and in the course of a conspiracy. The government is not required to prove that any defendant personally committed or knew about the overt act.

The government does not have to prove that the conspiracy succeeded or was achieved.  The crime of conspiracy is complete upon the agreement to commit either of the underlying crimes.

If you find that any defendant is guilty of the controlled substances conspiracy charge, you will also have to determine whether the government has proven beyond a reasonable doubt that the conspiracy of which he was a member involved marihuana, cocaine hydrochloride, cocaine base (crack cocaine), and/or heroin.


Instruction No. 22: Acts and Declarations of Co-Conspirators.

Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed, and that a defendant was alleged to be one of the members, then the alleged statements made and acts done by any person likewise found to be a member may be considered by the jury as evidence. The matter is subject to credibility and weight in the case as to a defendant found to have been a member, even though the statements and acts may have occurred before the defendant joined the conspiracy or in the absence and without the knowledge of a defendant. **Provided, however, that such statements and acts: (1) were knowingly made between the declarant and the person to whom the declaration is offered, (2) are both members of the conspiracy and, (3) are done during the continuance of such conspiracy, and in furtherance of some object or purpose of the**

**conspiracy.**

Any admission, incriminatory statement or act, be not knowingly made between a declarant and a person to whom the declaration is offered are both members of the conspiracy and/or not occurring during the conspiracy and/or not designed to further some object or purpose of the conspiracy, may not be considered as evidence against another person who was not present and did not hear the statement made, or see the act done.

**The three numbered elements described above must be present for the jury to provide credibility and weight to consider a co-conspiratory statement made by a co-defendant as evidence.** (Emphasis ours.)

The court instructions to the jury in the instant case, as emphasized herein, clearly comply with the standard of United States v. De la Cruz, Id.

4. Consciousness of guilt.

Finally, there is a totally independent basis to admit the attempted spoliation of evidence at the Rio Hondo lunch meeting. Spoliation of evidence constitutes "the intentional destruction of evidence  by an affected party." Spoliation "is probative of consciousness of guilt." United States v. Copeland, 321 F. 3d 582, 597 (6th Cir. 2003, Amended Opinion) (holding that threats to co-witness to eliminate or affect evidence constitute spoliation). In the instant case, the spoliation was not a threat to a witness but the attempted spoliation by the fabrication of evidence, a sworn statement, to attempt to offset the evidentiary effect of the black box evidence found full of illegal drugs. Said black box and its narcotics content was then known to defendants to be the most critical evidence as to the fabrication of criminal cases against innocent victims. At the time of the attempted spoliation plan, the defendants ignored there were cooperators, audio tapes and video/tapes evidence. It is common sense that attempting to destroy, or offset, the most critical evidence, three days after the black box was found by an execution of a search warrant, constitutes probative

51

evidence. The First Circuit has found in several cases that a cautionary specific instruction as to consciousness of guilty is not always required. See United States v. Valencia Lucena, 925 F.2d 506, 513-514 (1st Cir. 1991) (no consciousness of guilt required as to the use of two pseudonyms); United States v. Littlefield, 840 F.2d 143, 148-149 (1st Cir. 1988) (consciousness of guilt instruction " should not be given"); United States v. Indorato, 628 F.2d 711, 720 (1st Cir. 1980) ("we are not persuaded that a consciousness of guilt instruction was necessary."). The court opines that in this particular case, since the jury does not leave common sense at home, a plan to offset the most critical piece of evidence known then to defendants in the case, planned barely three days after the evidence is discovered, constitutes a matter of common sense and does not require a specific cautionary instruction.

The court, therefore, finds that no legal issue is "close" as to the civil rights conspiracy guilty verdict to the point of being decided the "other way" on appeal, and hence, the bail request of Luis Ruperto Torres is **DENIED**.

CONCLUSION

The court upon, after having examined the evidence "in the light most favorable to the verdict" under United States v. Wihbey, 75 F. 3d at 774, has determined that there is sufficient evidence to convict,  and also finding no legal or factual issue "close" under United States v. Bayko, 774 F.2d at 223, **DENIES** the bail request of co-defendants  Pascual

Santiago-Méndez,  Anthony Domínguez-Colón,  Víctor Cortes-Cabán, and Luis Ruperto-Torres under the standards of bail after verdict codified at 18 U.S.C. 3143.

**IT IS SO ORDERED**.

At San Juan, Puerto Rico, this 30th  day of January 2009.


**S/Daniel R. Domínguez**
**DANIEL R. DOMINGUEZ**
**U.S. DISTRICT JUDGE**