**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**[2] PASCUAL SANTIAGO-MENDEZ,
[3] ANTHONY DOMINGUEZ-COLON
[4] VICTOR CORTES-CABAN
[5] LUIS RUPERTO-TORRES**

Defendants.

**CRIMINAL NO. 07-346 (DRD)**

**OPINION AND ORDER AS TO RECONSIDERATION OF
FED. R. CRI. PROC. 29**

The court has denied on several occasions the defendants' request of dismissal pursuant to Rule 29. Not convinced, co-defendants insist. The court has, therefore, received various Motions to Reconsider. Co-defendant Luis Ruperto-Torres [5], found guilty only as to Count I, the Civil Rights conspiracy under 18 U.S.C.A. 241, has filed two motions, Dockets 391 and 455.[1] Co-defendant Anthony Domínguez-Colón [3], found guilty as to Counts I and II, conspiracy as to civil rights, Count I, and conspiracy to possess with intent to distribute controlled substances, Count II, has filed three motions, Motion Pursuant to Rule 29; Second Motion . . . and Third Motion. . ., Dockets 386,405, and 427. Co-defendant Pascual Santiago-Méndez [2] has filed two motions, Motion to Join Second and Third Rule 29 Motions filed by Anthony Domínguez-Colón, Docket 454 and Motion Pertaining to Count II, Docket 480. Co-defendant Víctor Cortés-Cabán [4] has filed a

---

[1]     The court is addressing the motions in the order of filing.

1

Motion to Join Second and Third Rule 29 Motions filed by Anthony Domínguez-Colón, Docket 441.

I.

### THE STANDARD UNDER RULE 29 OF THE
### FEDERAL RULES OF CRIMINAL PROCEDURE

The standard under Fed. R. Cri. P. 29 is identical in both the trial and the Court of Appeals; "the [trial] tribunal must discern whether, after assaying all the evidence in the light most flattering to the government, and taking all reasonable inferences on its favor, a rational fact finder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. Hernández, 146 F.3d 30, 32 (1st Cir. 1998) citing United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994). The trial court is required to "consider all the evidence, direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict." United States v. Hernández, 146 F.3d 32, citing United States v. Carroll, 105 F.3d 740, 742 (1st Cir.); cert. denied 520 U.S. 1258 (1997). Further, "the jurisprudence of Rule 29 requires that a deciding court defer credibility determinations to the jury." Id. citing United States v. O'Brien, 14 F.3d at 706. Moreover, there is "no special premium on direct evidence." Id. cited in United States v. Hernández, 146 F.3d at 33; "the prosecution may satisfy its burden of proof by direct evidence, circumstantial evidence or any combination of the two." Id. citing United States v. Echevarri, 982 F.2d 675, 677 (1st Cir. 1993).  Expressed in alternate fashion "no premium is placed on direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction." United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992). As to evidentiary conflicts "the trial judge must resolve all evidentiary conflicts and

credibility questions in the prosecution's favor; and moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt." United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995). On the other hand, "[t]he court must reject only those evidentiary interpretations that are unreasonable, unsupportable, or only speculative and must uphold any verdict that is supported by a plausible rendition of the record." United States v. Ofray Campos, 534 F.3d 1, 31-32 (1st Cir. 2008). See also United States v. Cruz Laureano, 404 F.3d 470, 480 (1st Cir. 2005) urging the trial court "not to believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record" (citing United States v. Gómez, 255 F.3d 31, 35 (1st Cir. 2001).

Recently the First Circuit reiterated the standard in United States v. Meléndez Rivas, ___F.3d___, 2009 WL 1351125 (1st Cir. PR May 15, 2009) (No. 07-1962), citing United States v. Limpscomb, 539 F.3d 31, 40 (1st Cir. 2008) as to the sufficiency standard for a Motion of Acquittal under Rule 29 as follows: "Viewing the evidence in the light most flattering to the jury's verdict, we assess whether a reasonable fact finder could have concluded that the defendant was guilty beyond a reasonable doubt." The court, therefore, can not discard the satisfaction of the requirement of the standard of "guilty beyond a reasonable doubt."

## II.

## BACKGROUND

The appearing defendants all were found guilty of both Counts I and II except co-defendant Luis Ruperto-Torres who was found not guilty only as to Count II, conspiracy to

3

possess with intent to distribute controlled substances. They all requested Bail Pending Sentencing. They all alleged a colorable case of sufficiency of evidence under Rule 29, hence the court was forced to analyze the leading case of the First Circuit as to bail after verdict, the case of United States v. Bayko, 774 F.2d 516, 522-523 (1st Cir. 1985) discussing sufficiency of evidence reaching the threshold of being "a substantial question of law or fact likely to result in . . .reversal" under 18 USCA 3143(a)(2)(A)(I). In Bayko, id., the First Circuit Court interprets the phrases "substantial question of law or fact" to mean that the matter is a "close question of fact or one that very well could be decided the other way." The District Court, therefore, originally analyzed at the Bail Order, Docket 460, within the Bayko analysis sufficiency of the evidence criteria presented as to all co-defendants.[2]

III.

### THE INDIVIDUAL DEFENDANTS CHALLENGE

### AS TO SUFFICIENCY OF EVIDENCE

A.  Luis Ruperto-Torres - Dockets 391, 455, 467.

Co-defendant Luis Ruperto-Torres [5] challenges the verdict via a Rule 29 Motion on two grounds, a sufficiency of evidence, Docket 391, and as a matter of law on an allegedly  inconsistent  verdict. Both of these issues were examined by the court in resolving  the bail request of co-defendant Ruperto-Torres under a Bayko analysis as the court was forced to examine whether there was a close question of "law or fact . . . that very well could be decided the other way," United States v. Bayko, 774 F.2d 522-523. The

---

[2]    The court is aware that there are also pure issues of law within the Rule 29 requests of defendants. The court shall identify  the allegations at the end of the instant opinion and order. The pure questions of law within a criminal Rule 29 are reviewed under a de novo standard. United States v. Meléndez, ___F.3rd___, 2009 WL 1351125 citing United States v. Teleguz, 492 F.3d 80, 86 (1st Cir. 2007).

court provided the analysis at Docket 460, p. 26-29 as to the insufficiency of evidence under Rule 29 and as to matters of law at Docket 460, p. 38-51.   The court further analyzed the matter at the Reconsideration of Bail Order, Docket 469.

The court briefly recapitulates the sufficiency of law as to each of the appearing co-defendants.

First, co-defendant Ruperto-Torres participated in the fabrication on July 10, 2007 of evidence against Wilfredo Enrique Pérez (sometimes called Wilfredo [Henriquez] Pérez), "W.H.P." in the indictment, Count I, Section 5(d). Wilfredo Enriquez Pérez and attorney José "Pita" Martí Fajardo testified about the arrest of Enriquez. José Martí Fajardo was a lawyer and neighbor of Enriquez who saw the arrest. He lived next to Enriquez's house. "Pita" Martí was barely a few feet from Enriquez when he was arrested. When Enriquez was arrested and searched, no drugs were found on him as seen by "Pita" Martí. Yet later Enriquez's wife called Martí to assert her husband was arrested for allegedly possessing drugs.   "Pita" Martí vehemently challenged the police who had arrested Enriquez near "Pita's" residence. He was released by the police at the precinct but notwithstanding Enriquez was falsely detained. The facts as to the detention of Wilfredo Enriquez Pérez are fully narrated in the testimonial transcript of Wilfredo Enriquez Pérez and "Pita" Martí.

"Pita" Martí again challenged the police when he met them again the very next day in Mayaguez court on another criminal case being attended by counsel Martí not related to the instant case. Wilfredo Enriquez Pérez identified Luis Ruperto-Torres as one of the persons who detained him in front of his residence.

On July 12, 2007 Luis Ruperto-Torres returned to the scene of the arrest by

5

expressing a desire to return to "Pita's for a moment" during the search and seizure conducted of innocent persons at El Carmen and Candelaría Public Housing Buildings. See Docket 460 p. 36-57. Luis Ruperto-Torres recognized Enriquez, who lives in front of "Pita" Martí stating "look at flaco, where we arrested him" referring to Enriquez, "look here is the guy we arrested." D. 460 p. 37, referring to the Transcript of the Trial, Ex. 11 p. 44-47.

Luis Ruperto-Torres also participated in the fabrication of cases against innocent individuals at El Carmen and Candelaria Public Housing Projects. Luis Ruperto-Torres was the leader of the raid and the highest ranking police officer present. (D. 460 p. 36-36, referring to the Transcript of the video and audio tape of July 12, 2007 at Ex. 11, video and audio transcript, p. 5-47). Luis Ruperto-Torres was the policeman in charge of the logistics of entering and exiting the El Carmen and Candelaria Public Housing Projects. (D. 460 p. 27, referring to Ex. 11 p. 7, video/audio and video transcripts.) He also directed the safe entry and exits from the public housing buildings and the sequential order to be followed from building to building. D. 460, referring to Ex. 11 p. 8-9. Luis Ruperto-Torres also determined the targets, D. 460 p. 28-29. He further determined the number of arrests needed to be made prior to the actual arrests being executed, Ex. 11 p. 7. (Bosques: "How many arrest." L.R. "Around eight." Bosques: "Eight." L.R. "Eight.") The individual targets of the raid were not actually originally arrested. Their names were taken allegedly only to receive drug treatment, but in reality they were to be charged later at the precinct with a drug offense in order to satisfy the quota of arrests that had to be maintained by the precinct. D. 460 p. 29 referring to D. 398 p. 29, 32.  Three persons actually suffered an illegal arrest as a result of the operation at El Candelaria and El Carmen Public Housing

6

Projects. D. 460 p. 30, referring to D. 398 p. 37-45.  Finally, it was pellucid that the purpose of the raid was an "instruction of Sargent Ruperto-Torres to get statistics that [had to be without] [sic] [were short of the] statistics which we had to justify." D. 460 p. 41, referring to D. 398 p. 41-45.

Finally, there is no doubt that Luis Ruperto-Torres knew that the conduct of Bosques, the cooperator co-defendant, included aiding and abetting on that day in the fabrication of evidence against otherwise innocent citizens at El Carmen and Candelaria Public Housing Projects. Luis Ruperto-Torres referred to Bosques during the raid at El Carmen and Candelaria Public Buildings as the "mass destruction machine" of fabricated drug cases. Luis Ruperto-Torres immediately then denominated himself as the "drunkards' mass destruction machine" referring to himself as a fabricator of cases against drunken drivers while working at another precinct.  D. 460 p. 32-35 referring to Ex. 11 p. 32-41.

Co-defendant Luis Ruperto-Torres also alleges as a critical error in denying the Rule 29 Motion that the verdict was "inconsistent," D. 464. Defendant was found not guilty as to Count II, conspiracy to possess with intent to distribute controlled substances under 21 U.S.C. 846 but guilty as to conspiracy against civil rights. The court strongly disagrees.

In the realm of the First Circuit an inconsistent verdict is "essentially unreviewable." United States v. Figueroa Encarnación, 343 F. 3d 23, 29 Fn. 3 (1st Cir. 2003) (citing United States v. Powell, 469 U.S. 57, 105 S. Ct. 41 (1984); Dunn v. United States, 284 U.S. 390, 52 S. Ct. 189 (1932). In Figueroa Encarnación, supra, the issue before the court was "whether a defendant may be convicted for possession of a weapon in furtherance of a [drug] trafficking crime under 924( c), even if he is acquitted under a drug possession crime." United States v. Figueroa Encarnación, 343 F. 3d 29. Expressed in another

7

fashion, whether a defendant could be found guilty of possessing a weapon in furtherance of a drug crime [or a violent crime], notwithstanding that the defendant is found not guilty of the underlying substantive drug crime, or violent crime, associated with the weapon. The answer provided by the Court of Appeals  is squarely against the defendant Luis Ruperto-Torres' legal position: "We join several of our sister circuits in holding that a defendant may be convicted for possession of a weapon [used during a drug crime or a violent crime] . . . even if the defendant is acquitted of the underlying drug possession case." By analogy, defendant, notwithstanding being acquitted of possessing drugs, could still be found guilty of violating the civil rights of innocent victims. The critical matter is whether or not there was sufficient evidence to satisfy the elements of the crime of violation of civil rights beyond a reasonable doubt. United States v. López, 944 F.2d 33, 41 (1st Cir. 1991). The court understands that the facts stated above satisfy the elements of the crime for a conspiracy to violate civil rights of innocent citizens via violation of due process by the fabrication of a narcotics case.

Defendant further alleges that the court used "stray remarks" stated by co-defendant Ruperto-Torres referring to Bosques as the "mass destruction machine" as to fabricating civil rights cases by defendants in the instant case. The court used, not stray remarks[3] but defendant's admissions that he fabricated cases against drunken drivers within the context of defendant's conversation with co-defendant Bosques. Luis Ruperto-Torres called

---

[3] A "stray remark" is a remark made by a non decision maker or a decisional maker unrelated to the decisional process in the work place within a discrimination context. González v. El Día,304 F.3d 63, 69 (2002);  Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 13 (1st Cir. 1998);  Ayala-Gerena v. Bristol Myers Squibb Co., 95 F.3d 86, 96 (1st Cir. 1996).  In the instant case the remark is an admission by defendant Ruperto-Torres, admissible under Fed. Ev. R. 802.

Bosques the "mass destruction machine" of drugs while the raid at the public housing buildings of Candelaria and El Carmen was occurring.  At the same time Luis Ruperto-Torres referred to himself as the "drunkards' mass destruction machine" admitting that he fabricated cases against alcoholics when he worked at another police precinct. The reasonable inference that could be made by the jury is that Luis Ruperto-Torres, a fabricator of drunken driver cases, "the drunkards' mass destruction machine," knew very well what Bosques was doing at Candelaria and El Carmen public dwellings when he referred to Bosques as "the mass destruction machine," while Bosques was engaged in the fabrication of drug cases.[4]

The Rule 29 Motion as to Luis Ruperto-Torres is **DENIED**.

B. Anthony Domínguez-Colón [3] - Dockets  386,405, and 427.

Co-defendant Domínguez-Colón participated in Bosques' request to Pascual Santiago as to the "mother fuckers from over there [in a public housing] driving me nuts and I do not know what to do . . ." Pascual Santiago states: "Well you know what to do [referring to planting drugs]." Bosques says "But I need to get some. . .". Pascual says "all right come over." Bosques then asks "Am I [to] come down?" Bosques says "at least a couple of bags [unintelligible]." [Later it is pellucid by subsequent statements of other co-defendants who intervened on the same day that they were all referring to a couple of bags of small quantities of marihuana and cocaine.] Pascual agrees and says "all right sir, yes, yes." (Ex. 4(a) first taped phone conversations with Pascual on the specific subject matter.)

---

[4]    The Court of Appeals in Boston in entering Judgment Denying Bail as to co-defendant Luis Ruperto-Torres on May 20, 2009 in case number 07-346 determined that there was no "close" question or "one that very well could be decided the other way."

Various police agents, co-defendants in the instant case, later participated as to delivering the drugs to Bosques.

Pascual later states to Bosques that co-defendant Luis Vélez-Class is to provide the drugs.  "I left it with Vélez."  Ex. 4b.  Pascual Santiago states that it was "whatever you want [referring to the drugs]."   However, Vélez Class is with his wife in San Juan at a doctor's appointment. Ex. 4( c). [Pascual tells him [Vélez] but "he [Vélez-Class] didn't tell me it was for today." Vélez-Class clarifies that "[Pascual] doesn't know I am here today [in a doctor's appointment in San Juan]." Bosques then offers that the narcotics transactions "may be tomorrow or the day after." Ex. 4( c) p. 3. Vélez-Class reiterates that: "Because Pascual spoke with me . . .  Pascual spoke with me, the thing is that I am not over there at work." Ex. 4( c) id.

At Exhibit 4(d) Bosques speaks with Santiago and informs him that Vélez is not in Mayaguez because "Vélez is in San Juan." Santiago then offers to speak to co-defendant Bey-Arce. Santiago states "and how about Bey, is he in the division . . .call Bey he should be there." Ex. 4(d) p. 1. Bosques subsequently calls Bey. See Ex. 4(e). Bey agrees to check if there is an availability of a couple bags of grass and cocaine. Specifically Bosques asks for a "couple of bags of grass and a couple of coke." Bey says "alright, I'll check over there to see if there is some."[5] Ex. 4(e). [Bey later called [unrecorded], as testified by Bosques, stating he would not be available.]

However, when Bosques arrives at the drug division of the police precinct, fully wired to continue corroborating evidence, the person that ultimately delivers the drugs to him is

---

[5]      Bey was found innocent of both counts.

co-defendant Anthony Domínguez. The court briefly explains. Bosques is wired when he arrives at the drug division precinct and asks to speak to Domínguez, "listen to me for a second I am coming to give confidential information to Domínguez. I need you to leave me alone to speak with Anthony Domínguez." Ex. 4(g) p. 6. Later Bosques asks Domínguez as the latter is delivering the drugs: "What do you have, what's that. A couple of bags more? A couple of coke?"  Domínguez confirms and answers the further request for more drugs, "all right." Ex. 4(g) p. 10. Moreover, Domínguez recognizes that prior thereto he had spoken to co-defendant Bey. "That's what I told Bey."[6]

Finally, Domínguez asks Bosques "are you wired up, you mother fucker, because you're making some fucking questions." Bosques changes the subject "let me take my vest because there's no need for me to be here. We'll talk later." Ex. 4(g) p. 14.

Various agents participated in a conspiratorial manner in essentially producing the drugs to Bosques. As explained above, Pascual Santiago-Méndez originally designated Vélez-Class to deliver the drugs, but Vélez-Class was in San Juan with his wife in an appointment. Vélez-Class further did not know that the drugs were to be delivered on that same day. Pascual Santiago-Méndez then selected Bey who originally accepted but later in an unrecorded call, as testified by Bosques, excused himself as not being able to deliver the drugs. When eventually Bosques arrives, it is co-defendant Anthony Domínguez who delivers the drugs. (Ex. 4g.) Bosques records the conversation at the Mayaguez Precinct

---

[6]     The fact that Domínguez was able to produce the drugs notwithstanding that neither Pascual Santiago Méndez nor Luis Vélez-Class was in the police precinct, both of whom had at one time the control of the "black box," leads the court to the inescapable conclusion that the possession of the drug was "joint" in nature. Bey also never expressed any doubts on this same day in producing the drug notwithstanding the absence of Pascual Santiago Méndez and Luis Vélez Class.

with Domínguez as Bosques had by then been wired by the federal government. Bosques requests even more drugs than originally requested; Domínguez produces them recognizing that he had spoken to Bey, "that's what I told Bey." Domínguez at one point has doubts as to whether Bosques is wired.  Domínguez says: "Are you wired up, you mother fucker, because you are making some [sic] [so many] questions." Bosques changes the subject: "Let me take my vest because there's no need for me to be here." Ex. 4g, p. 4.

Anthony Domínguez also participated in the fabricated arrest of Wilfredo Enriquez Pérez with Luis Ruperto-Torres and others. The event is succinctly and accurately narrated by the United States in its Omnibus Response Motion at Docket 463 as follows:

> As testified to by Wilfredo Henrique Pérez (Pérez), Domínguez was the officer who chased, arrested, assaulted, and then threatened to fabricate a case against him involving two decks of heroin on July 10, 2007. (Counts One and Two, Overt Acts 5(d)). However, Domínguez' plan was interrupted by the arrival of Jose Marti-Fajardo, a.k.a. "Pita Marti" (Marti), a 30-year defense attorney and eyewitness to the arrest of Pérez, who arrived at the Division a short time later and angrily confronted Domínguez about the false arrest of Pérez. This angry confrontation resumed the next day when Marti chanced upon Domínguez at the Mayaguez Courthouse and advised that he (Marti) knew Pérez did not have any controlled substances in his possession and that a case was being fabricated against Pérez. The angry confrontation between Domínguez and Marti at the Division was confirmed by Marti's testimony[2] and the undercover recordings between Bosques and Cortés on July 11, 2007 (Trial Exhibit 7), as well as the undercover recording between Bosques and Ruperto on July 12, 2007 (Trial Exhibit 11). Furthermore, during the recorded conversation between Bosques and Cortés on July 11, 2007, Cortés admitted that Pérez did not have any controlled substances in his possession and that he (Cortés) gave Domínguez a small bag of narcotics to plant on Pérez. Lastly, Vélez testified that upon the request of Domínguez, he (Vélez) retrieved two small decks of heroin from the "black box" and left them on Domínguez' desk so he could use it in the fabrication of the case against Pérez.

Although the arrest was frustrated by counsel José Martí Fajardo, also known as "Pita", the victim, Wilfredo Enriquez Pérez (also spelled Henriquez), was at least falsely

arrested and detained in the precinct of the Mayaguez Unit. Drugs were actually delivered by co-defendant Cortés to Domínguez to be planted on Wilfredo Enriquez Pérez.

Anthony Domínguez has also filed a motion entitled Second Rule 29 Motion and Third Rule 29 Motion, Dockets 386 and 427 which constitute purely issues of law which the court addresses in this opinion and order after discussion of the sufficiency of the evidence as to the remaining defendants. Co-defendants Víctor Cortés-Cabán and Pascual Santiago-Méndez at Dockets 441 and 454 joined the motions of Anthony Domínguez entitled Second and Third Motions Rule 29.

The request to dismiss of Anthony Domínguez is, therefore, **DISMISSED** as  to sufficiency of evidence allegations.

C. Víctor Cortés-Cabán [4] - Docket 441 and 454.

Víctor Cortés-Cabán was confronted by FBI agents as he exited the court house in Aguadilla, Puerto Rico.

As correctly summarized by the United States in the Omnibus Opposition to Rule 29 Motion, Docket 463, p. 9-10, he admitted when confronted that he had just sworn two false affidavits before a local state judge of the Commonwealth of Puerto Rico. The search warrants were the result of a surveillance he performed with co-defendant, cooperator, Josue Bosques Muñiz on July 11, 2007. The search warrants were trial Ex. 9 and 10. The surveillance was the object of a recording at trial Ex. 7. The false arrest by Cortés was due to his seeking revenge against the victim for filing a complaint against him. During the subsequent meetings with the FBI, Cortés admitted that in the search warrants he had falsely produced, "at least twenty five percent of the information." The incriminatory evidence against co-defendant Cortés-Cabán was summarized "in the light most flattering

to the government and taking all reasonable inferences in its favor," <u>United States v.</u>

<u>Hernández</u>, 146 F.3d 32, by the United States at Docket 463, as follows:

> As testified to by FBI Special Agent Julio Tobar, Victor Cortés-Cabán was approached by Tobar and Special Agent Edward Dorsey outside the Mayaguez Courthouse on July 17, 2007. After waiving his right to remain silent and consult with an attorney, Cortés admitted that he just swore out two false search warrants before a judge of the Commonwealth. These search warrants (Trial Exhibits 9 and 10) were the result of surveillance that Cortés conducted along with Bosques on July 11, 2007. As already discussed, this surveillance was the subject of an undercover recording (Trial Exhibit 7) made by Bosques wherein Cortés admit ted that he (Cortés) was seeking revenge against an individual for filing a complaint against him (Cortés). This undercover recording also confirmed the falsity of the information to which Cortés swore in the search warrant affidavits related to seeing any narcotics transactions during the surveillance. During subsequent meetings with the FBI, Cortés admitted that in all the search warrants he has ever sworn out, at least twenty-five percent of the information was false.

> Defendant Cortés is also featured in the undercover video recording made by Bosques on July 12, 2007. (Trial Exhibit 11) After their sweep through the El Carmen and Candalaria Public Housing Projects collecting names, all officers involved in the operation retired to the Division to complete arrest reports in order to meet their statistical requirements. Shortly after arriving at the Division, Cortés is seen, clear as day, distributing two decks of heroin to Bosques for use in the fabrication of cases. Not only can this distribution be seen on the undercover video, but Bosques testified to the transaction and Cortés admitted to the FBI that he provided the heroin to Bosques.

As to co-defendant Cortés-Cabán's confession the court summarized the pertinent

facts at Docket 460, p. 20-21:

> The incriminating facts as to co-defendant Víctor Cortés Cabán relating to the count as to violation of civil rights are relatively simple. He confessed twice and on each occasion he signed a document entitled Advice of Rights. See Exs. 18 and 19. Specifically, FBI agents waited for co-defendant Cortés Cabán to exit the court house in Aguadilla, Puerto Rico, and in the parking lot of the court house, the FBI agents, informed him that he had just fabricated a criminal case by signing a false affidavit related to a search and seizure. He followed the FBI agents to the FBI car wherein he signed at 4:23 p.m. on July 17, 2007 a document recognizing that he had been duly forewarned as to his rights under <u>Miranda</u> v. <u>Arizona,</u> 384 U.S. 436, 444 (1966). Defendant Cortés Cabán began to confess by accepting his signing of the false affidavit. He then proceeded to request the FBI officers to move the automobile to another location as he did not want to be observed in the car with the

14

FBI agents, in the parking lot of the court house. The FBI automobile proceeded to another parking lot across the street from the court house parking lot used by a small shopping center. Once location of the automobile was changed, Cortés Cabán continued to confess and fully accepted, providing further information as to his participation in the false statement used to arrest a citizen. He agreed to return and later meet the FBI agents. Most critical, on yet another day, he voluntarily returned to the FBI facilities in Aguadilla, PR, on July 21, 2007. He again signed another document entitled Advice of Rights at 8:45 a.m. at the FBI offices before his interrogation was resumed. The FBI agent was Julio Tovar, who testified as to the events of July 17 and July 21, 2007. Julio Tovar explained that he could not recall specifically how the defendant arrived on the second day but that standard procedure was that the person is driven to known location, and is picked up and from there driven by FBI agents to the FBI offices.  The court first determined the admissibility of the confession on a hearing away from the jury on December 10, 2008, making specific findings to determine the surrounding circumstances as to a voluntary, knowing and intelligent waiver of rights associated with the Miranda standards and the voluntariness and non coercive nature of the confession.

Hence, co-defendant Cortés-Cabán was the subject of video and audio evidence, testimonial evidence and further he confessed to his crime twice, most critically evidenced when he, out of his own volition, returned to the offices of the FBI to finish his debriefing which constituted an outright acceptance of his voluntary, willful and knowing confession. The Rule 29 of co-defendant Víctor Cortés-Cabán as to insufficiency of evidence is DENIED.

D. Pascual Santiago-Méndez [2] - Docket 480.

Co-defendant Pascual Santiago-Méndez was the keeper of the "black box" containing a variety of drugs; cocaine, crack cocaine, heroin and marihuana. The contents of the "black box" were  verified by expert testimony based on the drugs' chemical analysis. Drug paraphernalia was also found in the "black box". At various times during the conspiracy Pascual Santiago-Méndez was the person in charge of distributing drugs to other police co-defendants from said box. Pursuant to testimony of co-defendant

cooperator Luis Vélez-Class he observed Santiago and co-defendant Anthony Domínguez-Colón in possession of the "black box". When Santiago-Méndez went on vacation, he provided the "black box" to Luis Vélez-Class.

It was not a coincidence that when Bosques requested help as to neighbors that were "driving him nuts," Bosques, originally addressed the request to Santiago-Méndez , the keeper of the "black box," who then intended to have the drugs delivered by Vélez.[7] However, as Vélez-Class was with his wife in a medical appointment, the drugs were eventually produced by Anthony Domínguez. These facts were all corroborated by audio tapes of phone calls.  The eventual delivery of the drugs to Josue Bosques by Anthony Domínguez was corroborated by Bosques wearing a wired audio tape. (Trial Ex. 4(a)-(f).)[8]

The same day that the "black box" was discovered,  Santiago-Méndez and Vélez-Class began plotting the fabrication of evidence to offset the damaging effect of the "black box" found in the precinct at Vélez-Class' desk that was the subject of the issued federal warrant. Santiago-Méndez was the coordinator of a later lunch meeting in a restaurant at Rio Hondo Shopping Center in Bayamón between Santiago, co-defendants Muñiz-Tirado [1], Vélez-Class and Efraín Bey to spoliate the "black box" evidence by the fabrication of a sworn statement attempting to falsely show that the "black box" was evidence found in a public housing project  containing legitimate evidence not yet duly registered in the regular course of business.

---

[7]     Pascual Santiago-Méndez prior to mentioning drugs, when he asked for help stated, "but you know what to do."  Ex. 4(a).

[8]     The requirement of "beyond a reasonable doubt" is clearly satisfied as the statements of Bosques are corroborated by taped phone calls and a wired conversation with Domínguez.

The evidence to attempt to offset the "black box" through the spoliation of evidence, is not only admissible as spoliation, but is most critical because "where the substantive crime that is the object of the conspiracy has the intent to conceal as an element, **the success of the conspiracy itself may depend on further concealment**. Consequently, additional acts of concealment that facilitate the control aim of the conspiracy are in furtherance of the conspiracy."  (Emphasis ours.)  United States v. Upton, 559 F.3d 3, 13 (1st Cir. 2009) citing United States v. Goldbergh, 105 F.3d 770, 774 (1st Cir. 1997); United States v. Esacove, 94 F.2d 3, 5 (5th Cir. 1991) and United States v. Dazey, 403 F.3d 1147, 1159 (10th Cir. 2005).

Hence, the attempt to cover up and spoliate the "black box", which began originally on the same date that the box was discovered by the search warrant and terminated at the luncheon at Rio Hondo Shopping Center on July 20, 2007,  constituted acts "in furtherance of the conspiracy," United States v. Upton, 559 F. 3d at 13 and therefore are not facts relative to a separate conspiracy.[9]

Pascual Santiago-Méndez further was the co-defendant that fabricated a drug case together with Luis Vélez-Class. The facts were testified relating to overt act 5( c) of Count I and were expressed at the United States Omnibus Response at Docket 463, p. 7:

> Vélez also testified to the events of June 26, 2007, involving Omayra Segarra-Lopez, a.k.a."Puchi" wherein Santiago provided Vélez the cocaine that he (Vélez) admitted planting in "Puchi's" house and the marijuana that he (Vélez) admitted planting in "Puchi's" car, all of which resulted in the arrest of "Puchi" and her husband. (Counts One and Two, Overt Act 5(c)). He also testified to participating in three search operations at the Columbus Landing Public Housing Project later

---

[9]     The attempted spoliation was frustrated as, notwithstanding "[S]antiago'[s] repeated (sic) [insistance] that Vélez complete a false police report relating to the story of how the "black box" was found, . . ., Vélez never completed the report." Docket No. 463, p. 7.

that evening. Before each operation, Santiago would provide Vélez cocaine to be planted in various residences so that the search warrants would come out positive.

The motion to dismiss under Rule 29 relating as to sufficiency of evidence of Pascual Santiago-Méndez is DENIED.

The court briefly recapitulates the evidence against all co-defendants, Luis Ruperto-Torres, Anthony Domínguez-Colón, Victor Cortés-Cabán and Pascual Santiago-Méndez.

E. Summary of Facts:

The court must examine the evidence as to the sufficiency standard in the following fashion: ". . . in the light most flattering to the jury's verdict . . . assess[ing] whether a reasonable fact finder could have concluded that the defendant[s] was guilty beyond a reasonable doubt." United States v. Meléndez-Rivas, ___ F.3d at ___. Further, in examining conflicting testimony the court must "resolve all evidentiary conflicts and credibility questions in the prosecution's favor, and, moreover, as among competing inferences, two or more which are plausible, the judge most choose the inference that best fits the prosecution's theory of guilt." United States v. Olbres, 61 F.3d at 970. The court must, however, "reject only those evidentiary interpretations that are unreasonable, unsupportable or only speculative and most uphold any verdict that is supported by a plausible rendition of the record." United States v. Ofray-Campos, 534 F.3d at 31-32. Keeping in mind the above cited holdings, the court recapitulates the evidence as follows:

E. (1) Luis Ruperto-Tores [5]:

Co-defendant Luis Ruperto-Torres was involved in the fabrication of evidence as to Wilfredo Enriquez Pérez whose arrest was frustrated by the participation of counsel "Pita" Martí. Notwithstanding, Wilfredo Enriquez Pérez was illegally detained at the Mayaguez

18

drug precinct.

Co-defendant Ruperto-Torres further unquestionably lead the police raid at Candelaria and El Carmen public housings to satisfy a drug arrest quota.  He previously determined the number of arrests of that day, the logistics of the entrances/exits into the public housings and once at the public housing areas he determined the targets. Further, he knew that the raids were to satisfy a shortage in drug arrest statistics. (D. 460 p. 41., referring to D. 398, p. 41-45.).  He knew precisely that the purpose of the public housing raid was to fabricate drug cases when he referred to cooperator, co-defendant Bosques, as the "mass destruction machine" of false drug arrests and himself as the "drunkards' mass destruction machine" clearly accepting that in the past at another precinct he dedicated himself to fabricating evidence against drunk drivers. The raid at Candelaria and El Carmen  asked  persons that seemed to be addicts to supply their names and addresses for drug treatment when in reality the names were to be used to fabricate drug cases.

E. (2) Anthony Domínguez-Cabán [3]:

Co-defendant Domínguez-Cabán is the person who ultimately provided the drugs to Bosques as to the "neighbors that were driving [him] nuts."  Bosques tells co-defendant Pascual Santiago that "I do not [know] what to do."  Pascual Santiago states "well you know what to do." Bosques stated "But I need to get some." Pascual Santiago then starts the chain of co-defendants who participated in delivering the drugs to Bosques. Pascual Santiago originally selects Luis Vélez-Class. Pascual Santiago states to Bosques "I left it with Vélez." Pascual then had access to the "black box".   However, Vélez-Class is not available because he is in San Juan accompanying his wife at a doctor's appointment.

19

Defendant Santiago then selects co-defendant Efraín Bey-Arce and notifies Bosques. Bosques asks Bey-Arce for "a couple of bags of grass and a couple of coke." Bey agrees and says "alright, I'll check over there and see if there is some." But Bey is also ultimately unavailable and it is co-defendant Domínguez-Colón who delivers the drugs to wired co-defendant cooperator Bosques. Bosques receives the drugs from Domínguez and even requests "a couple of bags more, a couple of coke." Domínguez-Colón answers "all right." This entire delivery is corroborated by interception of telephone calls and the wired cooperator Bosques corroborates the delivery of drugs to him by Domínguez-Colón. Ex. 4(a)-4(g).

Domínguez further participated in the false arrest of Wilfredo Enriquez Pérez, also known as Wilfredo [H]enriquez Pérez, referred to in the indictment as W.H.P., Count I Section 5(d). Wilfredo Enriquez Pérez clearly identified him as one of the persons who arrested him.[10] This arrest was the arrest foiled by the aggressive participation of counsel "Pita" Marti.

Anthony Domínguez was also seen in possession of the "black box" full of illegal drugs as testified by Vélez-Class.

E. (3) Víctor Cortés-Cabán:

He swore false affidavits as part of an act of revenge against a victim who filed a complaint against him. He accepted that "at least 25% of the information was false." The false information was related to actually selling narcotics as stated in the court affidavit

---

[10]   On direct examination Wilfredo Enriquez Pérez originally wrongfully identified counsel Luis Rafael Rivera as one of the officers who arrested him. But on first cross examination by counsel Rivera, without a recess having been taken by the court, he accepted his error in having wrongfully confused counsels.

during the drug-related surveillance that he was performing.

He further admitted to having a proclivity to falsify narcotics search warrants wherein at least 25% of the information he provided was fabricated.

Cortés-Cabán further participated in the drug raid at El Carmen and Candelaria public housing projects on  July 12, 2007. Two decks of heroin were provided to Bosques for use in the fabrication of drug cases at the public housing projects as to the victims that were mislead into to believing they were merely providing their names and addresses for drug treatment.  Cortés admitted to providing the drugs to Bosques for arrest purposes.

Cortés confessed to the above facts on  two separate dates. First on July 17, 2007, after he left the Aguadilla Court house when he was confronted by FBI agents Tovar and Darsey and most critical on July 21, 2007 when he, of his own volition, returned  to the FBI to continue his debriefing.  Cortés-Cabán signed on  each date a written waiver of rights under Miranda v. Arizona, 384 U.S. 436 (1966).

Defendant was the subject of video and audio surveillance at El Carmen and Candelaria public housings and at the police precinct drug unit; he further confessed to his criminal participation on two different dates signing prior thereto to a waiver of his rights under Miranda.

E. (4) Pascual Santiago-Méndez:

He was the principal keeper of the "black box" who was in charge of distributing the drugs to other police co-defendants. Co-defendant Vélez-Class was in charge of the box when Santiago-Méndez was on vacation or otherwise unavailable. Anthony Domínguez was also seen in possession of the "black box."

Bosques originally requested help from Pascual Santiago as to neighbors who were

"driving him [Bosques] nuts." Pascual Santiago offered drugs and managed the logistics of providing the drugs to Bosques from Vélez-Class to Bey-Arce to Domínguez-Colón, the last being the co-defendant who eventually delivered the drugs.

Pascual Santiago also managed the logistics of attempting to spoliate the effect of discovery of the "black box" at the Mayaguez drug division precinct all resulting from a court search and seizure order.[11] The plot began the very first day that the "black box" was discovered by the authorities.  The attempted fabrication to spoliate evidence ended a few days later at a lunch meeting in a restaurant at Rio Hondo Shopping Center. The logistics coordinator of the lunch meeting was Pascual Santiago. The plan was to fabricate a sworn statement that the "black box" was the product of a legitimate arrest conducted by the police not yet duly registered in the regular course of police business. The restaurant meeting on July 20, 2007 was attended by co-defendants Santiago, Vélez-Class, Dennis Muñiz-Tirado[1] and Efraín Bey-Arce.

Santiago was also involved in the fabrication of evidence involving Omayra Segarra López as a victim, a.k.a. Puchi. See Counts I 5( c) and II 5 ( c).

VI.

ISSUES OF LAW

Pending before the Court are also the following motions all relating to issues of law: co-defendant, Anthony Domínguez' Second (Docket No. 405) and Third Motion Pursuant to Rule 29 F.R.Cr.P. (Docket No. 427), co-defendant, Victor Cortés- Caban's Motion to Join

---

[11]    The destruction of pertinent evidence or  spoliation is unquestionably pertinent and constitutes "probative" of "consciousness of guilt."  United States v. Capeland, 321 F.3d 582, 597 (6th Cir. 2003, Amended Opinion) (threats to co-witness to eliminate effects of evidence constitutes spoliation).

Second and Third Rule 29 Motions Filed by Anthony Domínguez (Docket No. 441)[12], co-defendant, Pascual Santiago-Méndez' Motion to Join Second and Third Rule 29 Motions filed by Anthony Domínguez (Docket No. 454), United States of American's Omnibus Response in Opposition to Defendants' Motion for Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure (Docket No. 463) and co-defendant, Pascual Santiago-Méndez' Motion Pertaining to Count Two Rule 29 (Docket No. 480).

After reviewing the instant case's record the Court finds that Co-defendants' requests under Rule 29 (Docket No. 405, 427), are to be **DENIED**.  The Court briefly explains.

First, as to Count Two, which charges Co-defendants with a conspiracy to possess with intent to distribute controlled substance, Co-defendants contend that since the intent required to commit the offense is a specific intent, not a general one, the government failed to present during the trial any evidence of the required specific intent, thereby failing to show that Co-defendants intentionally and willfully distributed controlled substances.  Co-defendants further contend that

> [a]t best and in the light most favorable to the government the evidence presented would only prove that defendants had to, as instructed by the director of the division Mr. Muñiz, to accomplish certain number of arrests and searches as required by higher officials by the Police of Puerto Rico, for this purpose it could be inferred that seized controlled substances would be shared.  The evidence at trial is that the supervisor gave drug[s] to the agents for the purpose of having "positive" findings and arrests not to distribute drugs.  Thus there is no specific intent to do so.
> . . .
> Velez Class testified that if he refused there were repercussions [which] would include a transfer outside of the area or some other punishment.

---

[12] On February 23, 2009, the Court entered an Order (Docket No. 470), granting co-defendant, Pascual Santiago Mendez' Motion for Joinder (Docket No. 454), as well as co-defendant, Victor Cortés-Cabán's Motion for Joinder (Docket No. 441).

. . .
The main admonition or threat that was used would be that you would be removed from the division and sent to another unit, specifically to the uniform division, to work in uniform.

Docket No. 427, pg. 3.  Moreover, Co-defendants aver that there was no intent to conspire to possess with intent to distribute controlled substances since all the indictment states is that the drugs were "shared" by the agents at the drug division.  Co-defendants further aver that although the "sharing" of drugs, as stated in the indictment, might have occurred, the act of so doing does not automatically constitute a conspiracy to distribute drugs, as in a simple buyer-seller relationship.

Second, as to Count One, which charges Co-defendants with conspiring to injure, oppress, threaten and intimidate persons in the town of Mayaguez, by planting controlled substances on or near them, thereby resulting in unreasonable seizures and unlawful detentions and/or arrests, Co-defendants aver that the government failed to present during the trial, any evidence of the required specific intent.  Hence, Co-defendants contend that no evidence was presented to show that they intentionally and willfully agreed to deprive citizens of their rights.  Co-defendants further aver that

[i]n the light most favorable to the government the evidence presented and the inferences therein would only sustain that [co-defendants] had to follow instructions [from their] supervisors in that the agents were required to have met specific statistics that if necessary had to be created. . . .  If at all, [Co-defendants] acted under instructions, admonitions or threats.

Id. at pg. 6.  The Court disagrees.

It has been well established that in order to prove beyond a reasonable doubt that a Defendant willfully and intentionally joined a conspiracy to commit a crime, said agreement and intent may be inferred from the surrounding circumstances.  See United

24

States v. Alemany Rivera, 781 F.2d 229, 234 (1st Cir. 1985) ("The gist of [a] conspiracy is an agreement to disobey or to disregard the law.  Two types of intent must be proven: intent to agree and intent to commit the substantive offense. . . .  A conspiratorial agreement may be proven by circumstantial as well as direct evidence. . . . 'A common purpose and plan may be inferred from a development and collocation of circumstances.' . . .  The government need not exclude every reasonable hypothesis inconsistent with guilt with respect to each piece of circumstantial evidence.  Rather, 'the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient to warrant the jury to conclude that defendant is guilty beyond a reasonable doubt.'. . . As *Drougas* makes clear, agreement and intent need not be proven by direct evidence; they may be inferred circumstantially. **Furthermore, a conspiratorial agreement need not be express, but may consist of no more than a tacit understanding.**"  (*Emphasis ours*) (quoting United States v. Drougas, 748 F.2d 8, 15 (1st Cir. 1984), and citing United States v. Pintar, 630 F.2d 1270, 1275 (8th Cir. 1980)).  Hence, the government is not required to provide a specific piece of evidence that by itself proves the specific intent of the Defendants.  The evidence in the case was that the defendants engaged in a conspiracy to plant evidence, and/or, unreasonable search and seize of victims by the planting of evidence (illegal narcotics) depriving citizens of liberty without due process of law. The facts narrated above comply with "intent to agree and intent to commit the substantive offense." The circumstantial evidence of planting illegal drugs on otherwise innocent victims shows that the planting of evidence would reasonably lead to a violation of liberty and due process.

As to Count Two, the Court finds that there was ample evidence, as narrated above, from which the jury could infer that Co-defendants willingly and intentionally conspired to possess with intent to distribute controlled substances in order to use the transferred controlled substances to fabricate criminal cases.[13]  The Court further finds that although Co-defendants' ultimate goal might have been to comply with certain Police Department statistics (a legal act), the fact is that in order to comply with those statistics, Co-defendants willingly and intentionally conspired to possess with **intent** to distribute controlled substances among themselves (an illegal act), to plant the drugs, fabricate the cases (an illegal act), and therefore comply with the statistics.  In the same manner that  although the ultimate goal of drug traffickers might be to make money (a legitimate end), that does not mean that their conspiracy to possess with intent to distribute controlled substances (an illegitimate mean) in order to sell the drugs and make money, is unwilling or unintentional. Moreover, the fact that Co-defendants might have been motivated or pressured in some way by their supervisors to comply with certain statistics does not excuse in any way the committing of crimes, nor does it substitute or eliminate the evidenced willingness and intention of Co-defendants to conspire to possess with intent to distribute controlled substances among themselves.

Regarding Co-defendants' allegation that the sharing of drugs does not automatically constitute a conspiracy to distribute drugs, the Court finds that the evidence presented during the trial clearly showed that Co-defendants' were not "merely sharing"

---

[13]     It should be noted that the evidence presented at trial does not in anyway show that the Defendants were possessing and distributing the controlled substances in order to use them in legal drug enforcement operations.  On the contrary, the evidence clearly showed that the agents were possessing the controlled substances for the illegal purpose of fabricating criminal cases.

controlled substances for their own personal use, like in a simple buyer-seller relationship. The evidence clearly showed that Co-defendants conspired with each other to meet at specific places and specific times to distribute or deliver to each other the drugs that were in the "black box," which was usually under the control of either co-defendant, Pascual Santiago-Méndez, or co-defendant Vélez-Class, in order to plant the drugs in a specific place or on a specific person and therefore be able to effectuate a fabricated but seemingly legitimate search and/or arrest.  Hence, the Court finds that the factual scenario and evidence presented during trial in no way shows that Co-defendants were merely sharing the drugs for personal use, or in a simple buyer-seller relationship.

As to Count One, the Court also finds that there was ample evidence from which the jury could infer that Co-defendants willingly and intentionally conspired to injure, oppress, threaten and intimidate persons in the town of Mayaguez, by planting controlled substances on or near them, thereby resulting in unreasonable seizures, unlawful detentions and/or arrests.  As aforementioned, the fact that Co-defendants might have been required to meet specific statistics does not excuse the committing of crimes nor does it substitute or eliminate the evidenced willingness and intention of Co-defendants to conspire to injure, oppress, threaten and intimidate persons in the town of Mayaguez, by planting controlled substances on or near them, thereby resulting in unreasonable seizures, unlawful detentions and/or arrests.

The court further notes that Count I as well as Count II are conspiracy counts wherein specially as to Count I, the drug conspiracy, the defendants did not have to actually carry or possess the drugs, the issue being whether the defendants participated in a plan to violate the specific underlying statute.

Consequently, for the reasons stated above, Co-defendants' Motions Pursuant to Rule 29 F.R.Cr.P. (Docket No. 405, 427), are hereby **DENIED.**

In regards to co-defendant  Pascual Santaigo-Méndez' *Motion Pertaining to Count Two Rule 29* (Docket No. 480), the court finds that said submittal is **DENIED.** The court briefly explains.

Co-defendant requests the Court to analyze the precise definition of the term "distribute" within the meaning of 21 U.S.C.A. § 841(a), which is one of the statutes charged in the indictment.  Co-defendant further requests the Court to dismiss Count Two pursuant to the Rule of Lenity.

Co-defendant states that the Rule of Lenity is defined as "'[t]he judicial doctrine holding that a court, in construing an ambiguous criminal statute that sets out multiple or inconsistent punishments, should resolve the ambiguity in favor of the more lenient punishment.'" Docket No. 480, pg. 1 (quoting Black's Law Dictionary 1069 (7th ed. 2000).

Since the Court notes an apparent confusion with the meaning of "distribution" stated in 21 U.S.C.A. § 841(a), the Court deems necessary to take this opportunity and clarify the same.  As stated in §841(a) "it shall be unlawful for any person knowingly or intentionally– (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, **distribute**, or dispense, a controlled substance. . ." (*Emphasis ours*).  In order to better appreciate the meaning of "distribute" we examine the specific definition found in §802(11), which states that "[t]he term 'distribute' means to deliver (other than by administering or dispensing) a controlled substance or a listed chemical."  We are therefore inclined to further our search and examine at the definition of "deliver" in §802(8), which

states that "[t]he terms 'deliver' or 'delivery' mean the actual, constructive, or attempted transfer of a controlled substance . . ."  Hence, the court finds that the term at issue, "distribution," read by itself or in the context of the statute as a whole, clearly means to deliver and/or transfer a controlled substance from one person to another.

The court, "[g]iven the clarity and specificity of Congress' definition of the term 'distribution,'" finds that 21 U.S.C.A. § 841(a) is clearly unambiguous and therefore finds no reason to invoke the Rule of Lenity and dismiss Count Two as requested by co-defendant, Pascual Santiago-Méndez.  United States v. Santistevan, 39 F.3d 250, 255 (10th Cir. 1994); see also United States v. Robertson, 459 F.3d 39, 51 (1st Cir. 2006) ("We accord the statutory text its ordinary meaning by reference to the specific context in which that language is used, and the broader context of the statute as a whole. . . .If the statutory language provides a clear answer, the inquiry ends.") (Internal quotations and citations omitted).  Therefore, for the reasons stated above, co-defendant, Pascual Santiago-Méndez' *Motion Pertaining to Count Two Rule 29* (Docket No. 480), is hereby **DENIED**.

In conclusion, co-defendants' [2] PASCUAL SANTIAGO-MENDEZ**,** [3] ANTHONY DOMINGUEZ-COLON**,** [4] VICTOR CORTES-CABAN , all as to Counts One and Two, and [5] LUIS RUPERTO-TORRES, requests for the dismissal of Counts One, all pursuant to Rule 29 F.R.Cr.P. (Docket No. 405, 427), are hereby **DENIED**, and co-defendant, [2] PASCUAL SANTIAGO-MENDEZ', *Motion Pertaining to Count Two Rule 29* (Docket No. 480), is also **DENIED**.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 18th day of June 2009.

s/Daniel R. Domínguez
**DANIEL R. DOMINGUEZ**
**U.S. DISTRICT JUDGE**